99 A.3d 866

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Mark Newton SPOTZ, Appellant.**

**No. 576 CAP.**

Supreme Court of Pennsylvania.

Sept. 3, 2014.

### SINGLE JUSTICE OPINION ON POST–DECISIONAL MOTIONS

Chief Justice CASTILLE.

### I. Introduction

The central ancillary motion pending here asks that I withdraw my Concurring Opinion because I commented on the conduct and agenda of appellant's counsel, who are affiliated with the Philadelphia-based Federal Community Defender's Office ("FCDO"). I began my concurrence by noting that the source of the FCDO's funding for its questionable forays into state court capital proceedings was not clear, though it appeared that the Administrative Office of Federal Courts (hereinafter "AO") played a central role, and that this federal role in state court capital litigation was implemented without the consultation or involvement of this Court or any other relevant Pennsylvania authority. I noted that:

> The federal courts—as well as other federal authorities and the Pennsylvania citizenry generally (who may not even be aware of this unusual federal activity in state courts)—may not be aware of just how global, strategic, and abusive these forays have become. The federal judicial policy has raised issues that should be known to the federal authorities financing and authorizing the incursions; to Pennsylvania's Senators and House members; and to the taxpayers who ultimately foot that bill. This is an appropriate case to highlight those issues.

*Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 330 (2011) (Castille, C.J., concurring, joined by McCaffery, J.). I added that I was writing to these global issues involving the FCDO, in part, because the cumulative effect of the FCDO strategy

and agenda "has taken a substantial and unwarranted toll on state courts." *Id.*

Consideration of the post-decisional motions in this case, and intervening developments in other capital matters involving FCDO appearances in state court, have confirmed and heightened the grounded concern with the conduct of the FCDO in this case, and more importantly, with its global agenda in Pennsylvania capital cases. As I will detail below, the incremental insinuation of the FCDO into Pennsylvania capital cases has been remarkable in its stealth and pervasiveness. The FCDO has designated itself the *de facto* State Capital Defender's Office, involving itself not only in virtually all capital PCRA[1] litigation, but also in direct capital appeals, and even, in one instance, as *amicus curiae* on behalf of a foreign nation, Mexico, in support of a Mexican national who murdered three people.[2] No authority—state or federal— appointed the FCDO to take on this statewide role, and no authority has approved the arrangement. Pennsylvania does not have a statewide capital prosecutor's office; and notably, in a great many capital cases, the chief law enforcement officer of the Commonwealth, the Attorney General, echoed by county prosecutors, has taken the position that the FCDO should not be permitted to continue in Pennsylvania capital cases without proving its specific federal authorization to do so.

In addition to comprehensively involving itself in state capital litigation without any authorization, the FCDO has established its monopoly through means known only to itself. Remarkably, when directed by this Court to provide simple and modest information confirming a claim that it has not supported its private capital case agenda in Pennsylvania with improperly diverted federal funds, the FCDO response—the response of these officers of the court, to the Court with supervisory authority over the practice of law in Pennsylvania-

---

1. Post Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.*

2. *See Commonwealth v. Padilla,* No. 567 CAP, discussed *infra.* The Court's decision affirming the judgment of sentence in *Padilla* is reported at 622 Pa. 449, 80 A.3d 1238 (2013).

has been refusal and the removal of cases to federal court, ensuring yet more FCDO delay in those capital matters.

The circumstances and obstructionist effect of the FCDO's silent takeover of the capital PCRA defense function in Pennsylvania requires that Pennsylvania reassert control over the litigation of state capital matters. Death penalty opponents, such as the FCDO, can then redirect their efforts to the political arena, where they belong. This Court has a responsibility for the entire Pennsylvania judicial system, to ensure the delivery of swift, fair, and evenhanded justice in all cases. We are not obliged to indulge or countenance a group which manipulates and abuses the judicial process in Pennsylvania in the hopes of achieving a global political result that it has failed to secure through the political process.

This restoration of proper authority will leave a void in the short run. But, the void is an opportunity to return capital case advocacy to principled moorings. The restoration will require that Pennsylvania authorities, including this Court, step up and ensure the provision of the funding, training and resources necessary to ensure that capital defense representation in Pennsylvania fully meets Sixth Amendment standards, with competent, properly compensated and dedicated lawyers who act zealously to advance the cause of their clients, but who act ethically as well, mindful of their duties to the courts and the justice system overall. I believe the Commonwealth is up to the challenge.

I do not in the least criticize principled representation of indigent capital defendants; such a principled endeavor represents lawyering in the best tradition of the bar. But, as I explain below, the FCDO continues to pursue an agenda beyond mere zealous representation, one which routinely pushes, and in frequent instances, as here, far exceeds ethical boundaries. FCDO lawyers appear in Pennsylvania courts **only** as officers of this Court; consequently, they are answerable to the Court. So long as the organization remains unauthorized to pursue its global agenda by any Pennsylvania authority, and so long as the FCDO refuses to be candid with the Court about its authorization and funding, it cannot be

permitted to continue its representation of capital defendants in Pennsylvania, absent a specific federal court order authorizing the specific endeavor in state court in an individual case.

Before proceeding to a discussion of the specific Motions pending before me, and to give a sense of the FCDO's conduct as viewed from the perspective of other judges not affiliated with this Court, I begin with but two examples. In *Abdul–Salaam v. Beard,* 16 F.Supp.3d 420, 2014 WL 1653208 (M.D.Pa.2014), the Honorable John E. Jones, III, of the Middle District of Pennsylvania, ended his nearly 200–page memorandum denying *habeas corpus* relief with the following observation:

> Nearly two decades have passed since Officer Willis Cole was murdered. Over nineteen years have elapsed since the trial that resulted in Abdul–Salaam's conviction. And yet this Memorandum and the Order that follows will not end the legal maneuvering that seeks to overturn both his conviction and resulting sentence of death at the hands of a jury of his peers.

> It was not until well after the founding of this nation that the federal writ of habeas corpus was extended to prisoners in state custody. But like a rolling freight train, the use of the Great Writ gathered speed in the ensuing decades. It was adopted by the federal courts, codified by Congress, revised, and to some degree limited in certain respects. But the case at bar amply demonstrates that there is something grievously amiss in both our laws and jurisprudence as they relate to federal habeas practice. For while we admire zealous advocacy and deeply respect the mission and work of the attorneys who have represented Abdul–Salaam in this matter, **they are at bottom gaming a system and erecting roadblocks in aid of a singular goal—keeping Abdul–Salaam from being put to death.** The result has been the meandering and even bizarre course this case has followed. Its time on our docket has spanned nearly all of our service as a federal judge—almost twelve years. We have given Abdul–Salaam every courtesy and due process, perhaps even beyond what the law affords.

And yet for the family of Willis Cole, and indeed for Abdul–Salaam and his family as well, there has been no closure. Rather, they have endured a legal process that is at times as inscrutable as it is incomprehensible. Moreover, it will soon take another turn as the Third Circuit Court of Appeals reviews our determination.

*Id.* at 511–12, *78 (emphasis supplied).

The PCRA trial court opinion in *Commonwealth v. Eichinger*, 657 CAP, which is a matter of public record in a capital appeal pursued by the FCDO currently pending before this Court, begins as follows:

In this capital case, Appellant ... appeals from an Order entered April 4, 2012, dismissing his [PCRA] petition.... If ever there were a criminal deserving of the death penalty it is John Charles Eichinger. His murders of three women and a three-year-old girl were carefully planned, executed and attempts to conceal the murders were employed. There is no doubt that Appellant is guilty of these killings. There is overwhelming evidence of his guilt, including multiple admissions to police, incriminating journal entries detailing the murders written in Appellant's own handwriting and DNA evidence.

We recognize that all criminal defendants have the right to zealous advocacy at all stages of their criminal proceedings. A lawyer has a sacred duty to defend his or her client. Our codes of professional responsibility additionally call upon lawyers to serve as guardians of the law, to play a vital role in the preservation of society, and to adhere to the highest standards of ethical and moral conduct. Simply stated, we all are called upon to promote respect for the law, our profession, and to do public good. Consistent with these guiding principles, the tactics used in this case require the Court to speak with candor. This case has caused me to reasonably question where the line exists between a zealous defense and an agenda-driven litigation strategy, such as the budget-breaking resource-breaking strategy on display in this case. Here, the cost to the people and to the trial Court was very high. This Court had to devote twenty two

full and partial days to hearings. To carry out the daily business of this Court visiting Senior Judges were brought in. The District Attorney's capital litigation budget had to have been impacted. With seemingly unlimited access to funding, the Federal Defender came with two or three attorneys, and usually two assistants. They flew in witnesses from around the Country. Additionally, they raised overlapping issues, issues that were previously litigated, and issues that were contrary to Pennsylvania Supreme Court holdings or otherwise lacked merit.

Opinion, Carpenter, J., July 25, 2012, at 1–2.

In Part VI, *infra*, I will address the FCDO's gravely misguided claim that their litigation strategies, including tactics like those displayed in this case, *Abdul–Salaam*, and *Eichinger*, are required elements of the capital defense function.

## II. Background

The Court affirmed the denial of PCRA relief in this case and today denies reargument. Disposition of reargument was delayed by ancillary Motions the FCDO[3] filed with the reargument petition, and further pleadings and circumstances occasioned by those Motions.[4] This Opinion and accompanying Order dispose of the FCDO's initial Motions, the Commonwealth's responsive Motions, and FCDO responses.

**3.** The Motion to Withdraw Concurring Opinion was signed by Michael Wiseman, Esquire, identifying himself as the supervisor responsible for the administration and operation of the FCDO's state capital litigation projects. Attorney Wiseman represented that "[h]e is fully familiar with and aware of all facts asserted in this Motion." In a later pleading discussed *infra*, the Chief Defender, Leigh M. Skipper, Esquire, responded to an administrative order the Court had specifically directed to Attorney Wiseman. Private counsel with the law firm Pepper Hamilton LLP filed the FCDO's final pleadings.

**4.** The pendency of the ancillary motions has not delayed the ultimate progression of appellant's case since the FCDO filed a federal *habeas corpus* petition immediately after this Court's Opinion was issued; that petition remains pending since the FCDO moved to stay the petition pending the outcome of appellant's collateral attack upon another one of his homicide convictions. See discussion in Part VI, *infra*.

A. *Ancillary Post–Decisional Motions and Per Curiam Administrative Orders*

Along with appellant's Reargument Application, the FCDO filed (1) a Motion for my Recusal on Reargument, (2) a Motion for Withdrawal of my Concurring Opinion, and (3) corresponding Motions for Leave to File the Motions as Post–Submission Communications. The FCDO also requested that I refer the primary Motions to the full Court for decision. The FCDO Motions focus solely upon objections to my Concurring Opinion. The Commonwealth responded with an Answer and Motion for Sanctions.

The Court as a whole entered a *per curiam* administrative Order on July 28, 2011, taking the FCDO Motions under advisement pending compliance with a directive contained in the Order, which was necessary to resolve the Motions. The Order noted that the Motion to Withdraw Concurring Opinion asserted as fact that I was "incorrect" to suggest that the FCDO may have misused federal funds by appearing in capital PCRA proceedings. In fact, the FCDO averred, it was in "full compliance with applicable federal administrative rules and regulations and has a separate source of funding to support" all of its non-appointed litigation activities in Pennsylvania state courts. The Order noted that the FCDO did not "provide or cite to those applicable rules and regulations," which the FCDO invoked as proof that the Concurring Opinion was "incorrect." To "properly determine the within Motions," the Court ordered as follows:

Michael Wiseman, Esquire, is hereby directed, as an officer of this Court, to file with the Office of the Prothonotary of the Supreme Court of Pennsylvania a verified "Statement of the FCDO's Involvement in Pennsylvania State Court Litigation of Capital Cases," which shall include the following:

(1) an identification and explanation of all federal authorizations and standards, including statutory and regulatory authority, governing the FCDO's conduct of capital litigation in Pennsylvania state courts;

(2) a listing of all Pennsylvania capital defendants the FCDO is currently representing, whether as primary counsel or through formal or informal assistance to Pennsylvania counsel of record, in Pennsylvania state courts, and whether by formal court appointment or not;

(3) an explanation of how the FCDO's representation came about in each case and, if instances of representation did not arise from formal court appointment, an accounting of the authority under which the FCDO undertakes representation in capital cases in Pennsylvania state courts in which it is not court-appointed.

Order, 7/28/11. Attorney Wiseman was directed to file the verified statement within thirty days. Madame Justice Todd filed a Dissenting Statement, which was joined by Mr. Justice Baer.

Attorney Wiseman neither complied with the order nor sought reconsideration or relief from it. Instead, on August 22, 2011, the Chief Federal Defender, Leigh M. Skipper, Esquire, entered his appearance.[5] Attorney Skipper also did not comply with the order or seek reconsideration or relief, but instead filed a 3–page pleading styled as "Appellant's Withdrawal" of the FCDO ancillary motions (hereinafter "Withdrawal pleading"). Attorney Skipper asserted, among other points, that, "The FCDO represents capital defendants in post-conviction proceedings in Pennsylvania state courts in order to satisfy the exhaustion of state remedies requirement" of the federal *habeas* statute, and 18 U.S.C. § 3006(A)(c) "permits attorneys to represent clients in ancillary matters 'appropriate to the proceedings.'" The pleading made no reference to whether the FCDO employed "a separate source of funding to support" those "ancillary" activities to exhaust federal claims. Withdrawal pleading, at 1–2 ¶ 3. The Commonwealth filed an Answer and requested a Rule to Show Cause why the FCDO should not be held in contempt for its

---

**5.** In Applications to Withdraw Appearance in other capital cases, Attorney Wiseman has stated that he "left his employ" with the FCDO on August 26, 2011, and is engaging in the private practice of law. *See Commonwealth v. Sanchez,* 605 CAP (motion filed 12/13/2012); *Commonwealth v. Sepulveda,* 553 CAP (motion filed 12/6/2012).

non-compliance with the July 28 Order. On October 3, 2011, the full Court entered a second administrative order which provided, in relevant part, as follows:

Neither Attorney Wiseman nor the FCDO sought reconsideration or a stay of the [July 28] Order. But, neither has the FCDO complied with the Order. Instead, on August 22, 2011, the Chief Federal Defender of the FCDO, Leigh M. Skipper, Esquire, entered his appearance and concomitantly filed the instant pleading, styled as a "Withdrawal" of the two FCDO Motions the Court had taken under advisement and already acted upon. The Chief Federal Defender asserts that the Order "call[ed] for an office-wide response" and thus he was responding to the Order with this pleading. Notwithstanding the "Withdrawal" styling, the pleading disputes the propriety of the *per curiam* Order, contains other argument, and requests action by the Court in the form of vacating our July 28 Order as moot.

The Commonwealth has responded to the "Withdrawal" pleading by requesting the Court to issue a Rule to Show Cause upon the FCDO to explain why presently it should not be held in contempt for its noncompliance with our prior Order. The Commonwealth notes, *inter alia,* that the primary stated reason for the "Withdrawal" is to enable Appellant to secure relief from his conviction in this Court so as to immediately proceed with federal *habeas corpus* proceedings; however, the Commonwealth further notes, over two months before filing the instant pleading, the FCDO had already filed a 392–page *habeas corpus* petition in federal district court on Appellant's behalf. Responding to the argument included in the "Withdrawal," the Commonwealth also notes that the authority the FCDO cites to support its activities in Pennsylvania state capital matters, such as this one, in fact does not authorize its activities; indeed, existing statutory and decisional authority, including authority from the U.S. Supreme Court, indicates that the FCDO's state-court activities are not authorized. The Commonwealth adds that, ["i]t is immaterial whether counsel deems withdrawal to be appropriate," as that decision is for

the Court. Moreover, the Commonwealth notes that its Motion for Sanctions, which was occasioned by the FCDO's prior two Motions, remains pending and under advisement, and the Commonwealth is not withdrawing that Motion; for that reason alone, the matter cannot be deemed moot even if the FCDO were authorized to unilaterally withdraw its pending Motions rather than respond to the Court's Order.

Upon consideration of the instant pleadings, it is hereby **ORDERED** that:

(1) The FCDO's "Withdrawal" is construed by this Court as an Application for Relief seeking Leave to Withdraw the FCDO's prior Motions, and the Application so construed is taken under advisement.

(2) Chief Federal Defender Leigh M. Skipper, Esquire, is hereby directed, as an officer of this Court, to file the verified Statement outlined in this Court's July 28, 2011 Order.

(3) In light of Attorney Skipper's citation to 18 U.S.C. § 3006A(c) in support of his claim that the FCDO's representation of Pennsylvania capital defendants in state post-conviction proceedings is lawful, Attorney Skipper is also directed to produce a copy of the federal court order appointing the FCDO to represent Appellant, to which the FCDO's activities in Pennsylvania state court in this case are "ancillary."

(4) The verified Statement and federal court order of appointment shall be filed within ten days of the date of this Order. No tangential pleadings from the FCDO are to be accepted by the Prothonotary in advance of the filing of the verified Statement.

(5) The Commonwealth's request for a Rule to Show Cause why the FCDO should not be held in contempt for its non-compliance with our July 28, 2011 Order is taken under advisement. Attorney Skipper shall file a response to the Commonwealth's request for a Rule to Show Cause within ten days of the filing of the verified Statement.

Order, 10/3/11. Justice Baer filed a Dissenting Statement, which was joined by Justice Todd.

B. *FCDO Response and Subsequent Pleadings*

Thereafter, Attorney Skipper filed a "Verified Statement in Response to the Court's Order of October 3, 2011" as well as a "Response" to the Commonwealth's Request for a Rule to Show Cause why the FCDO should not be held in contempt.

### 1. *Verified Statement*

The Verified Statement first addresses the authority of the FCDO to appear in capital cases in state court. Contrary to the FCDO claim in the Withdrawal pleading, Attorney Skipper no longer verifies that the FCDO's activities in state court are authorized by federal law as activities ancillary to the federal *habeas corpus* exhaustion requirement. Instead, Attorney Skipper concedes that the FCDO is authorized to represent state and federal death row inmates in federal court only pursuant to 18 U.S.C. § 3599(a)(2), which governs litigation of federal *habeas corpus* petitions filed under 28 U.S.C. § 2254 (state prisoners) and § 2255 (federal prisoners). Attorney Skipper next notes the federal *habeas* requirement that state prisoners fairly exhaust their federal claims in state court before pursuing them in federal court. Attorney Skipper states that 18 U.S.C. §§ 3006A and 3599 empower federal courts to authorize appointed federal *habeas* counsel to represent capital defendants in state court. Attorney Skipper quotes Section 3599, which states that appointed federal *habeas* counsel shall represent the defendant at "every subsequent stage of available judicial proceedings." *Id.* § 3599(e). The key statutory qualifier is that the activity be "subsequent" to federal *habeas* review, and indeed, after quoting Section 3599(e), Attorney Skipper cites *Harbison v. Bell*, 556 U.S. 180, 129 S.Ct. 1481, 173 L.Ed.2d 347 (2009), which held that Section 3599 authorizes appointed federal *habeas* counsel to represent state capital defendants in post-federal *habeas* state clemency review. Attorney Skipper notes that, in the course of its clemency discussion, the *Harbison* Court added a footnote observing that federal courts may determine, on a case by

case basis, that "it is appropriate for federal counsel to exhaust a claim in the course of her federal representation." *Id.* at 1489 n. 7. Attorney Skipper cites no federal authority for the proposition conveyed in the Withdrawal pleading, *i.e.*, that federal *habeas* counsel is authorized, by virtue of that appointment, to proceed to PCRA litigation and comprehensively exhaust claims in state court before pursuing federal *habeas* relief.

Attorney Skipper then adverts to—but does not provide—a "policy statement" of "the Judicial Conference Committee on Defender Services" predating *Harbison* by more than a decade which, he says, would approve of federal defender organizations exhausting state remedies for federal claims, "where authorized by the presiding federal judge." Attorney Skipper does not identify the authority under which this Committee operated, its composition, or whether the Committee's opinion had, or now has, actual force and effect; nor does he state whether the policy statement comprises the "applicable federal administrative rules and regulations" to which Attorney Wiseman referred when he declared that the FCDO was in "full compliance" and that I was incorrect to suggest otherwise.

Turning to the other statutory provision invoked to support the FCDO's state court capital activities, Attorney Skipper notes that 18 U.S.C. § 3006(c) authorizes appointed federal capital *habeas* counsel to represent capital clients in state court matters "ancillary" to federal *habeas* proceedings—but again, only when specifically authorized to do so by the federal judge presiding over an active *habeas* petition.

Attorney Skipper then argues that the restrictions in the federal statutory construct do not apply when the FCDO is "using non-grant [federal grant] funds" to finance its activities. Attorney Skipper states that nothing in federal legislation or AO "policies" prohibits FCDO lawyers from appearing as private lawyers in state court, so long as federal grant money does not finance that FCDO agenda. Attorney Skipper does not address whether the FCDO discloses to Pennsylvania courts when it is acting pursuant to the FCDO's private

budget and agenda, rather than as counsel approved for a limited purpose by a federal judge, supported by federal taxpayer funds.

Further explaining the supposed public/private hybrid status of the FCDO, Attorney Skipper says the FCDO receives private contributions and grants to engage in non-appointed activities through its "Pennsylvania Capital Representation Project." Attorney Skipper states that the AO is aware of the FCDO's "nonfederal fund" activities. Attorney Skipper attaches no supporting documentation, nor does he provide an explanation of the manner in which the FCDO'S state court activity in this case—including the commitment of six FCDO lawyers and numerous experts and investigators below, and preparation of the abusive brief filed on appeal—was funded. In addition, he does not suggest the amount of private funding available to support the FCDO's private capital agenda in state capital proceedings. And, he does not explain the mechanics of the hybrid operation: *e.g.*, are FCDO staff salaried or do they bill (publicly and privately) by the hour; are benefits such as health care, pensions, and leave time allocated between public and private funding, *etc.* Nor, again, does Attorney Skipper assert that the construct he describes represents the "applicable federal administrative rules and regulations" Attorney Wiseman referred to in asserting the FCDO's full compliance.

Attorney Skipper next states that the FCDO appears in state court capital proceedings under a "range of circumstances." In some cases, he says, a federal court has authorized the activity; no examples or copies of such federal court orders are provided. In other cases, he says, the FCDO is appointed by a federal court for federal *habeas* purposes and then determines to use nonfederal funds to appear privately in state court to exhaust state court remedies in advance of federal review. In other cases, he says, the FCDO makes cost-allocations between private and federal taxpayer funding. Attorney Skipper further declares that in some cases, the FCDO—using exclusively nonfederal funds—appears in state court to "protect" the rights of Pennsylvania capital prisoners

who, in its opinion, are likely to be entitled to FCDO represen-
tation if the case ever proceeded to federal *habeas* review.
Attorney Skipper adds that, in some instances, the FCDO has
been appointed to represent capital PCRA petitioners in state
court; he does not state under what authority such appoint-
ments were secured; in any event, these activities likewise
must fall under the FCDO's private agenda, since it would be
inappropriate to use federal funds for the endeavor.

Following this summary, Attorney Skipper represents that
"[t]he FCDO believes we have properly entered appearances"
in the PCRA cases he lists in an accompanying summary of
then-open Pennsylvania capital cases in which the FCDO was
involved. Moving from the question of entry of appearances
to the use of federal funds, Attorney Skipper continues that
the FCDO, in conjunction with the AO, "takes steps to ensure
that the costs of litigation are properly allocated between
federal and other funding sources" and, he declares, as of the
time of the Verified Statement at least, "such allocations are
proper." No definition of what are deemed to be "costs of
litigation" is offered. Nor is any documentation offered in
support of this averment, so that its accuracy may be meas-
ured here, in the context of the FCDO's allegation that my
Concurring Opinion must be withdrawn because, *inter alia,* it
"incorrectly" suggested that the FCDO misused federal funds
to support its private state court capital agenda.

Notably, however, Attorney Skipper states that, to dis-
charge his ethical duties, he now "corrects" Attorney Wise-
man's absolutist assertion of "the FCDO's 'full' compliance
with applicable federal administrative rules and regulations."
Attorney Skipper explains that internal reviews of cases "have
disclosed situations in the past in which prior allocations of
costs were not in full compliance with administrative rules and
regulations." Attorney Skipper does not identify these cases
where the FCDO violated federal funding restrictions, as
measured by the "administrative rules and regulations" he
does not provide and within a system of cost allocation that is
not described; nor does he explain how pervasive and long-
standing the violations were or whether the extraordinary

commitment of resources in this case represented one such violation.

Attorney Skipper next advises that the FCDO, along with the AO, is "taking further measures and adding additional safeguards" to ensure compliance with the undisclosed federal rules and regulations. No specifics or supporting documentation are offered to permit an assessment of the FCDO's prior claim of "full compliance," its current position that it was formerly non-compliant, but now is compliant, or its assurance that "new measures" will prevent a continuation or recurrence of the prior violations. Nor, significantly, are any specifics provided that would offer the Court any assurance that, in permitting the FCDO to litigate in Pennsylvania courts where it has not been specifically authorized by federal court order, Pennsylvania courts are not facilitating a continuing, improper diversion of federal taxpayer money to support the FCDO's private capital case agenda. In this regard, it is notable that the FCDO never indicates in its entries of appearance and its pleadings in Pennsylvania courts whether it is appearing in its capacity as purely-privately-funded counsel, or in its capacity as the federally-financed "federal defender." The FCDO affiliation by which FCDO lawyers routinely identify themselves gives the impression that the organization's appearances in state court are sanctioned and supported by the federal government.

The Verified Statement next addresses this Court's directive to identify the Pennsylvania capital defendants the FCDO was then representing or assisting, whether the involvement was by court appointment, and how and under what authority the FCDO was involved if not by court appointment. Attorney Skipper first seems to suggest that Congress's restrictions on appointed federal *habeas* counsel's appearances in state court does not prevent the FCDO from diverting federal funds to investigate prospective federal claims and provide the fruit of that labor to "clients" who may then present the claims in state court. Parenthetically, this is a strange assertion given Attorney Skipper's prior averments. Under Attorney Skipper's own account, federal funds may

only be employed in state court with specific federal court authorization. Moreover, the FCDO has no "client" for purposes of federal grant expenditures except when it has been appointed to actively pursue federal *habeas corpus* relief, which can only occur after the defendant's state court remedies have been exhausted: that is the statutory *sine qua non* for court-authorized "ancillary" or "subsequent" state court litigation. Attorney Skipper identifies no statute that permits the diversion of federal tax dollars for advance shadow activity in support of a non-client's state court capital pleadings. To the extent the FCDO continues to use federal funding for this sort of activity, the "further measures" and "additional safeguards" Attorney Skipper adverts to do not address the problem.

Attorney Skipper also provides a chart with a list of cases— cases in addition to the untold number of "fruits of its labor" cases-in which the FCDO was then providing representation in Pennsylvania state courts to capital defendants, or was consulting with lawyers actually appointed or retained for the purpose. The chart also lists whether the FCDO was appointed and by what court, and if not, how the FCDO became involved.

The chart is a remarkable snapshot of just how thoroughly the FCDO has involved itself in Pennsylvania state capital litigation. According to the chart, FCDO lawyers were then **actively** providing representation in Pennsylvania state court litigation in 108 relevant cases, 97 of which were capital. (From other notations, it appears that the 11 noncapital matters involve defendants who have or had separate capital convictions; presumably, the litigation was pursued in the hope of generating collateral grounds to attack the capital convictions.)

As a preliminary aside, the increasing frequency with which this Court has seen FCDO involvement in Pennsylvania state court capital matters of course was already suspicious. Moreover, it became difficult to ignore the FCDO's abusive litigation tactics in individual cases. *See Spotz*, 18 A.3d at 340–42, 344–45, 348 (Castille, C.J. concurring, joined by McCaffery, J.)

(discussing, *inter alia, Commonwealth v. Abdul–Salaam,* 606 Pa. 214, 996 A.2d 482 (2010); *Commonwealth v. Bracey,* 604 Pa. 459, 986 A.2d 128 (2009); and *Commonwealth v. Banks,* Nos. 461, 505 and 578 CAP (series of *per curiam* orders in response to FCDO delays and obstruction)). But, I admit that I had little idea just how pervasive the FCDO presence, and the consequent potential for its litigation abuses, had become. It is starkly apparent, from the FCDO's chart and my own review of Pennsylvania capital cases, that a group of federally-financed "private" lawyers has managed to insinuate themselves into virtually every Pennsylvania capital case where they can manage the intrusion. Indeed, the FCDO has proven adept at inserting itself into cases even where the defendant has made clear that he does not want FCDO assistance, or to further the FCDO agenda. And, as my discussion below demonstrates, the FCDO's effective self-appointment as a sort of statewide defender in capital PCRA matters has been achieved without the input, much less the approval, of any relevant Pennsylvania authority. The propriety of the unapproved arrangement is beyond dubious, given the FCDO's demonstrated obstructionist private agenda.

The FCDO chart identifies 28 cases from the complement of 108 where FCDO involvement resulted from simply entering its appearance, without appointment or authorization by any court, state or federal.[6] To be lawful, the FCDO's activity in all 28 of these cases must be supported solely by nonfederal funds.

The FCDO chart lists another 63 cases—including this one—as instances where its involvement is by "entry of appearance and appointed by federal court."[7] Attorney Skipper

6. In 3 of these 28 cases, the FCDO states that it was appointed by the federal court in an unrelated noncapital case.

7. The FCDO identifies 7 additional cases where it was appointed by a Pennsylvania trial court, including one as standby counsel. In 3 of the 7 cases, the FCDO states that it was also appointed by a federal court; in a fourth case, the FCDO states that it was appointed as counsel for a next friend. Respecting the 3 cases where the FCDO says there was a concurrent federal court appointment, presumably the federal court did not unlawfully appoint the FCDO to pursue an initial PCRA petition in

does not explain the conjunctive notation. He also does not identify which—if any—of these federal court appointments authorized the FCDO to use federal grant funds to litigate PCRA petitions in state court. The specifics of the appointment orders, and the federal *habeas* status of the cases, would determine whether the activity was authorized and whether federal grant money properly may be employed.

Attorney Skipper does not specifically address whether the FCDO's pursuit of appellant's PCRA petition and appeal was supported exclusively by nonfederal funds. FCDO attorneys here identified themselves exclusively by reference to the FCDO; no suggestion was made that they were appearing in a private "volunteer" capacity, for example, as part of the Philadelphia Defender Association's "Capital Representation Project." As I explained in my Concurring Opinion, the FCDO's commitment of resources in this case was vast, including the deployment of half a dozen FCDO lawyers, numerous experts, investigators, paralegals, *etc.* in the PCRA court. That commitment of resources was followed by the FCDO's lengthy and abusive brief in this Court, which was filed only after significant delays occasioned by multiple extension requests detailing the enormity of the FCDO's task, and only after flouting this Court's briefing rules.

Notably, in the extension requests, FCDO Attorney Robert Dunham, Esquire, also made reference to his other capital case responsibilities as an FCDO lawyer, drawing no distinction between court-authorized litigation and appearances pursuant to the FCDO's private agenda. Among the responsibilities related was Attorney Dunham's preparation of an *amicus curiae* brief on behalf of the Government of Mexico in support of a Pennsylvania capital defendant. *See Commonwealth v. Padilla,* 567 CAP, later decision reported at 622 Pa. 449, 80 A.3d 1238 (2013), *cert. denied,* —— U.S. ——, 134 S.Ct. 2725, 189 L.Ed.2d 769 (2014). Presumably, the FCDO's provision of lawyering services on behalf of foreign nations to support their

advance of *habeas* review. *See* discussion *infra.* Thus, in all seven of these cases as well, the FCDO cannot divert federal funds to pursue its private agenda.

citizens who commit capital murders in Pennsylvania is supported by its private funding stream or by the Mexican government. Also, presumably, the AO was aware of and approved of this "nonfederal fund" activity, which caused delays in other Pennsylvania capital cases the FCDO pursued strictly as part of its private agenda.

Notably, the *Padilla* case is not listed on Attorney Skipper's chart of cases where the FCDO was involved. That is because, not coincidentally, Attorney Dunham withdrew his appearance in *Padilla* the very day before Attorney Skipper filed the Verified Statement. Attorney Dunham's *praecipe* in *Padilla* simply stated: "Kindly withdraw my previously entered appearance as counsel of record for Amicus Curiae, the United Mexican States, in the above-captioned matter and substitute Marc Bookman, who has entered his appearance on this date, as counsel of record for the United Mexican States." No explanation is given for the substitution or its timing; perhaps the *Padilla* case was one of the (unidentified) cases where the FCDO's allocation of costs was "not in full compliance with administrative rules and regulations." Attorney Bookman's entry of appearance for Mexico identifies him as affiliated with the "Atlantic Center for Capital Representation." The website for the ACCR notes that, in fact, "Prior to becoming the Director of ACCR, Marc Bookman was a public defender for 27 years and worked in the Homicide Unit of the Defender Association of Philadelphia since its inception in 1993." The FCDO, of course, operates under the umbrella of the Defender Association of Philadelphia, which apparently is the ultimate mastermind of this overall capital case agenda.

What is most troubling is that, although Attorney Skipper does not state the fact directly, the necessary implication of the averments in the Verified Statement is that federal tax dollars in fact financed the FCDO's extensive and abusive litigation activities in this case. The Court's October 3, 2011 *per curiam* order stated that, "In light of Attorney Skipper's citation to 18 U.S.C. § 3006A(c) in support of his claim that the FCDO's representation of Pennsylvania capital defendants in state post-conviction proceedings is lawful, Attorney Skip-

per is also directed to produce a copy of the federal court order appointing the FCDO to represent Appellant, to which the FCDO's activities in Pennsylvania state court in this case are 'ancillary.' " Attorney Skipper's response does not state that the FCDO's activities here were supported solely by the FCDO's private resources, and were **not** authorized federal expenditures ancillary to a federal court appointment. Instead, Attorney Skipper advised that he was complying with our directive by attaching the relevant "federal court appointment orders."

The two attached orders, however, reveal that the FCDO was never authorized to prosecute appellant's PCRA petition and appeal with federal funds, as ancillary to its appointment for federal *habeas* purposes. The orders were issued by the Honorable James M. Munley of the U.S. District Court for the Middle District of Pennsylvania. The first order, dated April 12, 2002, appointed the FCDO in connection with a stay of execution and directed the FCDO to file a federal *habeas corpus* petition within 120 days. The second order, dated May 10, 2006, was in connection with a second stay of execution; the order appointed the FCDO "to represent Petitioner in his to-be-filed habeas corpus petition," and the order directed that the petition be filed within 180 days. Neither order authorized the FCDO to litigate an initial PCRA petition on appellant's behalf, much less to do so by using federal funds. On November 27, 2002, Judge Munley denied the FCDO request to hold appellant's federal *habeas* proceedings in abeyance while the FCDO pursued PCRA relief; dismissed the federal *habeas* petition; and directed the clerk to close the case.

A week later, on December 4, 2002, the FCDO filed appellant's PCRA petition, a 275–page "initial" pleading, representing an extensive prior commitment of FCDO resources, all without federal court authorization. The representation that the FCDO's PCRA agenda here was authorized as ancillary to Judge Munley's orders—a representation that conveys that the litigation was legitimately financed with federal tax dollars—is contradicted by the attached orders themselves.

The next question, in the context of the FCDO motion claiming that my Concurring Opinion must be withdrawn because it was "incorrect" to question whether the FCDO's private agenda is supported by a misuse of federal taxpayer dollars, is whether the apparent diversion of funds here was an anomaly among the 63 cases where the FCDO says its state capital case activity was by entry of appearance and federal court appointment. Some of the 63 cases involve serial PCRA petitions, and it is **possible** that a federal judge authorized the FCDO to exhaust a discrete new claim in a serial PCRA petition, pursuant to footnote 7 of *Harbison v. Bell.* The FCDO does not identify which of the 63 cases involve serial PCRA petitions and which, if any, involve specific federal court authorization to litigate a serial PCRA petition. In fact, my review reveals that 50 of the cases involve **initial** PCRA petitions, and at least 3 of the 13 remaining cases, which appear to be serial PCRA matters, involve defendants the FCDO previously represented, or attempted to represent, in first PCRA petitions (*Commonwealth v. Emanuel Lester aka Ali; Commonwealth v. Antoine Ligons;* and *Commonwealth v. Ronald Puksar* ). Thus, at least 53 of these 63 cases involve FCDO litigation of initial PCRA petitions in advance of federal *habeas* review. Given the federal statutory scheme and *Harbison v. Bell*—as the FCDO's pleading here itself describes those restrictions—the FCDO's pursuit of its private agenda in the 53 cases cannot lawfully be supported by the diversion of a penny of federal funds.

But, the FCDO's averments concerning its authorization in this case suggest that it in fact has routinely diverted significant federal resources to support its private agenda. Again, the FCDO did not respond to this Court's order by claiming that its PCRA activities here were supported solely by its private funds Instead, the FCDO represents—incorrectly—that its abusive activities were "authorized" as "ancillary" to a federal court appointment. The 53 first-PCRA petition capital cases identified by the FCDO no doubt present like circumstances, *i.e.,* the FCDO federal appointment was to file a federal *habeas* petition, with no authorization to improperly

use federal tax dollars to pursue initial PCRA petitions in state courts. In short, the Verified Statement has neither claimed, nor documented, that the FCDO's actual litigation of these capital PCRA matters was supported solely by private funds.

While these ancillary matters have been pending, the Court has directed the FCDO to produce its federal court orders of appointment in a number of capital PCRA matters, including first-PCRA petition cases the FCDO chart identifies as instances where it is acting pursuant to federal court appointment. The FCDO responses and/or federal orders produced (and the motions generating the orders) corroborate that either no such order exists, or if there is an appointment order, the appointment is for federal habeas litigation only, and not for litigation of PCRA petitions. *E.g., Commonwealth v. Johnson,* 532 CAP; *Commonwealth v. Mitchell,* 617 CAP; *Commonwealth v. Tharp,* 637 CAP; *Commonwealth v. Davido,* 638 CAP; *Commonwealth v. Montalvo,* 639 CAP; *Commonwealth v. Powell,* 641 CAP. *See also Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108, 1151 (2012) (noting that FCDO was appointed by federal court only to prepare federal *habeas* petition).[8]

The federal PACER system confirms that FCDO appointments in Pennsylvania capital cases typically follow the plain congressional restriction and the even plainer holding in *Harbison v. Bell,* in that they are for purposes of federal *habeas* litigation only; the orders, like Judge Munley's, do not authorize the FCDO to litigate PCRA petitions using federal grant

---

8. In one case, *Tharp,* the district court declared that "[c]ounsel is directed to forthwith exhaust all of Petitioner's claims in the appropriate state courts of Pennsylvania." *Tharp v. Beard et al.,* Civil Action No. 04–1284 (W.D.Pa.) (order dated April 14, 2005). The appointment order, however, was still only for purposes of filing a federal *habeas* petition, and the court's later dismissal of the *habeas* action without prejudice stated that the dismissal rendered the prior order (including the FCDO appointment) "null and of no further force and effect." The order produced in *Commonwealth v. Solano,* 647 & 648 CAP, granted the FCDO's motion to stay federal *habeas* proceedings to permit state court exhaustion, and directed counsel to exhaust claims. But, this order likewise did not authorize the FCDO to misuse federal funds, in order to exhaust claims.

funds. *E.g., Commonwealth v. Busanet,* 623 CAP (federal appointment order entered 1/20/2004); *Commonwealth v. Walker,* 480 CAP (federal appointment order entered 3/8/2011—notably while Walker's PCRA appeal, litigated by four FCDO lawyers, was pending in state court; in appointing FCDO, court notes FCDO's representation that its lawyers "have represented Petitioner for many years").[9] The appointment order the FCDO produced in another case, *Commonwealth v. Weiss,* 655 CAP, is not an appointment order at all, but an order staying federal *habeas* review pending exhaustion of state remedies.[10]

The federal court appointment orders in *Mitchell* and *Davido* are accompanied by an FCDO acknowledgment that it was appointed only for federal *habeas,* and not to pursue a PCRA petition. The FCDO in each case then notes that it entered its PCRA appearance pursuant to its private agenda: "[a]s part of a nonprofit organization providing defender services, the FCDO may provide a broader array of defender services than those authorized by a federal appointment as the FCDO's resources permit." *Accord Commonwealth v. Terrance Williams,* 673, 668, and 669 CAP.[11] This general statement does not specifically claim that those "resources" derive strictly from the FCDO's private funding—although that is certainly the impression conveyed by the reference to the FCDO's nonprofit status, and its ability to provide a "broader array" of services than those actually authorized by Congress.

**9.** *See Commonwealth v. Walker,* 613 Pa. 601, 36 A.3d 1, 18 n. 2 (2011) (Castille, C.J., concurring) (noting FCDO involvement).

**10.** The *Weiss* order states that the "Petitioner" (not the FCDO, even assuming a prior order appointed the FCDO) was to file in state court to exhaust his claims. The order did not appoint the FCDO or authorize it to misuse federal funds to litigate the PCRA petition. *Weiss v. Beard et al.,* Civil Action No. 02–1566 (W.D.Pa.) (order dated 5/13/03).

**11.** The *Terrance Williams* case does not appear on Attorney Skipper's list of cases, as the most recent round of FCDO filings there postdate the submission of the Verified Statement. The case is notable because the FCDO's current federal court appointment, by the Honorable Michael M. Baylson, was only for purposes of preparing a state clemency petition. *Williams v. Beard et al.,* Civil Action No. 2005–3486 (E.D.Pa.) (order entered 8/24/2012). Nevertheless, the FCDO proceeded to file a serial PCRA petition, which is currently on appeal to this Court.

Notably, this "broader array" position is in tension with Attorney Skipper's stance in this case—where the question of the FCDO's authority is directly at issue, and the Chief Defender entered his appearance so as to provide an "office-wide response." Attorney Skipper has stated that the FCDO's extensive PCRA litigation activities here were "ancillary" to a federal court order that, in fact, did not appoint or authorize the FCDO to conduct any ancillary activities, much less to redirect federal grant funds. Although the FCDO's overall position is elusive and inconsistent, its core position, and its actual conduct, suggests its belief that it is free to redirect federal tax dollars to its private state court agenda whenever it has, or anticipates, a federal court appointment for purposes of federal *habeas* review. That position, which would apply to all 53 cases in this class, contradicts what the FCDO has admitted are the plain limitations in the federal statutory scheme and *Harbison v. Bell.*

It may be that Attorney Skipper, like former FCDO Attorney Wiseman, has made an error; that he realizes that the PCRA litigation in this case could not properly be supported with federal funds; that he further realizes that all 53 of the identified first petition capital PCRA matters involving federal court "appointments" can only be privately funded; and that he meant to convey that, in fact, the FCDO's private activities and agenda in every first petition capital PCRA matter have been funded exclusively with private resources. But, that is not what he has represented in his Verified Statement; and presumably, he did not so represent because he cannot truthfully state that it is so.

Obviously, even aside from Attorney Skipper's averments, it is highly unlikely that the FCDO has subsidized its massive private agenda in capital PCRA cases with purely private funds. It has been reported that the FCDO operates under a federal grant of some $16–17 million per year. It is difficult to believe that the FCDO has an annual private funding stream anywhere near that size, or indeed a funding stream sufficient to support the extensive litigation in this case alone. By the FCDO's own reckoning, it would need private resources suffi-

cient to litigate the other 52 first PCRA matters in which it was involved by appearance and supposed federal court "appointment," the 28 matters where it simply entered an appearance, the 7 additional cases where appointments were made by state court judges, its shadow assistance in the "fruits of its labor" cases, and its activities on behalf of foreign governments in support of their citizens who commit murder in Pennsylvania. And, when the FCDO enters a case, it deploys teams of investigators, paralegals, lawyers and experts, and reams of paper, pleadings, amendments, *etc.* Notably, on May 15, 2011, immediately after the Court's decision in this appeal, the *Philadelphia Inquirer* reported that David Rudovsky, Esquire, the President of the Philadelphia Defender Association, which oversees the FCDO, took the same position Attorney Skipper initially did in his Withdrawal pleading: *i.e.*, that the FCDO diverts federal grant money to support most of its work in capital PCRA litigation, claiming that federal law allows the diversion in advance of federal *habeas* review, so as to exhaust claims. The same article indicated that the FCDO's private funding stream was a modest $130,000.[12]

Asked for an explanation of authorization following Attorney Wiseman's allegation, however, the FCDO has now acknowledged that it may lawfully use federal grant funds to support state capital litigation only when specifically approved by a federal judge, and that power exists in a federal judge only on matters ancillary or subsequent to appointment to pursue federal *habeas corpus* petitions. The statutory authority cited by both parties here, as well as the decision in *Harbison v. Bell*, corroborates that these in fact are the controlling congressional restrictions on the use of federal funds. There is, in short, a disconnection between what the FCDO properly can do with its federal funding, as federal law provides plain as day and the FCDO itself understands it, and what the

---

**12.** I recognize that a reported interview with an FCDO director is hardly definitive evidence; I cite the reference because it squares with one of the FCDO's (admittedly changing) positions here, and because, in subsequent proceedings in Pennsylvania state cases, the FCDO has refused to explain its actual funding and deployment of federal resources, and has removed those inquiries to federal court. *See* discussion of *Commonwealth v. Mitchell*, 617 CAP, *infra*.

FCDO actually has done and continues to do with that funding in pursuit of its private agenda, as the FCDO tells it. In this case and all cases where the FCDO's capital PCRA litigation activities were not approved by a federal court in a federal *habeas* proceeding to which the PCRA litigation was properly ancillary or subsequent—and **no** first PCRA petition can so qualify—any diversion of federal money to finance the FCDO's private agenda would appear to violate federal law.[13]

While these Motions have been pending, the FCDO has been given multiple additional opportunities to discharge its duty of candor to Pennsylvania courts concerning the propriety of its extensive private capital case agenda, by which it has secretly managed to assume a monopoly role in capital PCRA defense. As I explain below, the organization ultimately has refused to do so. The organization's stance reflects its core political orientation: it insinuates itself into the role of *de facto* statewide defender in capital cases, claiming to this Court that it is acting solely as a privately-funded entity which need not answer to any Pennsylvania authority, and then claims, when put to the proof, that it is effectively a "federal officer" and cannot be asked for an accounting. The FCDO's contemptuous responses also shed light upon the instant Motions, and in particular, the FCDO's shifting accounts of its activity, authority, and funding. *See* discussion at subsection (5), *infra.*

### 2. *FCDO Response to Commonwealth's Request for a Rule to Show Cause*

The Court's order of October 3, 2011, quoted earlier, sets forth the Commonwealth's position on its request for a rule to show cause why the FCDO should not be held in contempt for its non-compliance with the order of July 28. Attorney Skipper responds by stating that the FCDO's decision not to comply but instead to file its "Withdrawal" pleading was reasonable and made in good faith, and was not in contempt of this Court. I will discuss these pleadings, as necessary, *infra.*

**13.** A second FCDO chart lists another 21 Pennsylvania capital cases where it is currently providing consultation services. These services likewise must be supported by purely private funding.

### 3. *Further Pleadings*

The Commonwealth responded to the FCDO's Verified Statement with a Request for Leave to file a Response, to explain why the Verified Statement is non-responsive. The Commonwealth also filed a Response to the FCDO's Answer to the Motion for Sanctions. Counsel with the law firm Pepper Hamilton LLP then entered an appearance as counsel for the FCDO and Attorney Skipper, and on November 29, 2011, filed: (1) a Motion to Strike the Commonwealth's Response to the Answer to the Motion for Sanctions; and (2) a Reply to the Commonwealth's Request for Leave to Respond to the Verified Statement. None of these pleadings are necessary to a proper decision of the primary matters; accordingly, I will deny the Commonwealth's request for leave to respond to the Verified Statement, and I will not consider its response to the FCDO Answer to the Motion for Sanctions. Nor will I consider the FCDO's two responsive pleadings. Finally, I will not burden the Court with a referral of these tangential motions.

### 4. *Tangential Matter at 157 EM 2011, removed to federal court by FCDO*

A further complication arose in November of 2011, when the District Attorney of Philadelphia County filed a petition seeking exercise of the Court's King's Bench jurisdiction to more broadly consider the propriety of the FCDO's activities in Pennsylvania state courts. *See In Re: Appearance of Federal FCDO In State Criminal Proceedings,* 157 EM 2011. The Petition alleged that the FCDO's appearances in Pennsylvania capital proceedings were illegal; that the Court should enforce federal law as well as its exclusive power to supervise the practice of law and the conduct of the courts in the Unified Judicial System; and that the Court should bar the FCDO from participation in state criminal proceedings, except where the FCDO has specifically been authorized to so litigate by a federal court order. The pleading included an extensive discussion of federal law, and offered examples of FCDO conduct in Pennsylvania cases that, the District Attorney claimed,

corroborated the concerns with the FCDO agenda that were addressed in my Concurring Opinion. The FCDO requested and was granted an extension of time to respond, noting it had retained outside counsel.

Rather than provide the response, on December 8, 2011, the FCDO filed a single-paragraph "Notice of Filing of Notice of Removal," relating that the FCDO that day had removed the King's Bench matter to the U.S. District Court for the Eastern District of Pennsylvania. The attached federal notice declared that the Commonwealth's petition "asserts claims against [the FCDO] based on and arising under federal law." The federal notice did not acknowledge the Commonwealth's supervisory state law issue involving the practice of law.

Although neither party contemporaneously informed the Court of the development, on December 14, 2011, the Commonwealth filed a notice of dismissal in federal district court per Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, and the removed federal matter is listed as "terminated." As a result, the Supreme Court Prothonotary administratively closed the King's Bench matter listed at 157 EM 2011.

5. *Tangential Matters: additional cases involving propriety of FCDO appearances removed to federal court by the FCDO*

The Philadelphia District Attorney more recently challenged the propriety of the FCDO's appearance in a specific capital PCRA appeal, *Commonwealth v. Mitchell*, 617 CAP. The District Attorney filed a Motion to Remove Federal Counsel on grounds that the FCDO's activities were not authorized by federal court order. As in 157 EM 2011, the Commonwealth argued that this Court had jurisdiction, had the obligation to enforce federal legislative restrictions on the FCDO, and had separate supervisory authority to determine who may properly appear as counsel in Pennsylvania proceedings.

The FCDO responded, in relevant part, that nothing prevented it from doing more than authorized by a federal court

appointment, **so long as federal funds were not employed.** According to the FCDO, federal law "does not prohibit an attorney from engaging in activities on behalf of a client that fall outside [the governing federal statute] and are not compensable with federal funds." The FCDO added that it had "non-federal resources" to support its nonfederal activities, noting that the Defender Association of Philadelphia had established the "Pennsylvania Capital Representation Project," which "receives private grant funds and contributions to support FCDO activities the federal sustaining grant cannot fund." The FCDO added that the AO is aware of its activities in state court "and the fact that they are supported through non-federal resources." Answer, ¶¶ 24–30.

In light of these representations, on January 10, 2013, this Court remanded *Mitchell* to the PCRA court for a determination of whether the FCDO could properly continue in the appeal. The *per curiam* order provided, in relevant part, as follows:

> [T]he matter is **REMANDED** to the PCRA court to determine whether current counsel, the [FCDO] may represent appellant in this state capital PCRA proceeding, or whether other appropriate post-conviction counsel should be appointed. In this regard, the PCRA court must first determine whether the FCDO used any federal grant monies to support its activities in state court in this case. If the FCDO cannot demonstrate that its actions here were all privately financed, and convincingly attest that this will remain the case going forward, it is to be removed. If the PCRA court determines that the actions were privately financed, it should then determine "after a colloquy on the record, that the defendant has engaged counsel who has entered, or will promptly enter, an appearance for the collateral review proceedings." See Pa.R.Crim.P. 904(H)(1)(c). We note that the order of appointment produced by the FCDO, issued by the U.S. District Court for the Eastern District of Pennsylvania at No. 2:11–cv–02063–MAM, and dated April 15, 2011, appointed the FCDO to represent appellant only for purposes of litigating his civil

federal *habeas corpus* action, and the authority of the FCDO to participate in this state capital proceeding is not clear. See 18 U.S.C. § 3599(a)(2) (authorizing appointment of counsel to indigent state defendants actively pursuing federal *habeas corpus* relief from death sentence).

Order, 1/10/13. Justice Todd filed a Dissenting Statement, which was joined by Justice Baer.

The remand should have been a simple matter: officers of the Court, operating under an ethical duty of candor, could provide the PCRA judge with proof of what they had alleged to this Court. Instead, after a remand hearing had been scheduled, on April 11, 2013, the FCDO, by its outside counsel, filed a Notice of Filing of Notice of Removal with the PCRA court. The FCDO stated that, on April 5, 2013, it had removed the representation question to federal court pursuant to 28 U.S.C. §§ 1442 and 1446(d).

Thereafter, the FCDO removed multiple other Pennsylvania capital cases to federal court where similar inquiries into the lawfulness of its state court capital agenda were being made— thus ensuring delays in every one of those matters. See *In re Proceedings Before the Court of Common Pleas of Monroe County, Pa. to Determine Propriety of State Court Representation by Defender Ass'n of Phila. Filed in Com. of Pa. v. Manuel Sepulveda*, 2013 WL 4459005, at *1 n. 2 (M.D.Pa. Aug. 16, 2013) (memorandum by Caputo, J.) (collecting cases) (hereinafter "*In Re FCDO (Sepulveda) I* ").

The FCDO never notified this Court of its removal action in *Mitchell*. The federal PACER system reveals three pleadings filed by the FCDO relating to *Mitchell*, all assigned to the Honorable Mary McLaughlin of the U.S. District Court for the Eastern District of Pennsylvania. I will describe the pleadings in *Mitchell* (which are representative of the FCDO's position in all the removed cases) only as they are relevant to assessing the FCDO's account to this Court of the basis, and the funding, for its extensive private litigation agenda in Pennsylvania capital cases.

First, under the docket number for the dormant federal *habeas* petition held in abeyance while the FCDO pursued Mitchell's PCRA petition, the FCDO filed a "Motion to Reactivate Case in Order to Enter an Order Directing Petitioner's Counsel to Exhaust Claims in State Court." In short, the FCDO sought retroactive federal authorization for extensive state court actions it had already undertaken and—according to what it told this Court—had supported strictly with its "private" resources. The FCDO related that, after filing the PCRA appeal now pending, it began investigating new claims not pursued by PCRA counsel. (In fact, the brief the FCDO eventually filed in this Court raises 15 claims, many of which are new, non-federal claims alleging that Mitchell's PCRA counsel was ineffective.) The federal pleading stated that the FCDO conducted this **serial** PCRA investigation in "reasonable anticipation" of one day being appointed to serve as Mitchell's federal *habeas* counsel. Meanwhile, the FCDO prepared and filed a federal *habeas* petition on March 25, 2011, which included the new claims it had developed. The FCDO asked to be appointed to represent Mitchell on the federal *habeas* petition it had already prepared; and then asked that the same petition be held in abeyance. Both requests were granted. The federal court, however, never appointed the FCDO to litigate the PCRA appeal and the new claims the FCDO had developed.

The FCDO then remarkably claimed that both the Commonwealth's Motion to Remove Counsel and this Court's order "are part of a broader, ongoing effort on the part of some prosecutors' offices ... to deprive capital petitioners" of FCDO representation. The FCDO noted instances where this Court remanded for determinations of whether the FCDO should be permitted to remain in a capital case; instances where county prosecutors made challenges to FCDO appearances; and instances where the Pennsylvania Attorney General's Office sought to disqualify it. In each case, the FCDO said, it had removed or will remove those questions to federal court.

Turning to its legal argument, the FCDO claimed that our remand in *Mitchell* "directs the PCRA court to take action against the FCDO that is pre-empted by federal law." The FCDO alleged that the propriety of its appearance in *Mitchell* was not "unclear" merely because it acted without authorization. The FCDO further argued that the federal court had the authority to expand the FCDO's appointment to encompass pre-federal *habeas* matters under *Harbison v. Bell* and 18 U.S.C. § 3599, notwithstanding that those authorities speak of state court proceedings subsequent or ancillary to federal *habeas* review. Finally, the FCDO opined that *Mitchell's* claims will never be "properly exhausted" unless the FCDO does the exhausting.

Judge McLaughlin denied the reactivation motion in a memorandum dated August 15, 2013. *See Mitchell v. Wetzel,* 2013 WL 4194324 (E.D.Pa.2013). Judge McLaughlin noted that the FCDO was requesting her to "expressly authorize the FCDO to pursue Mitchell's state court proceedings in the scope of its federally funded duties." *Id.* at *2. Judge McLaughlin's reasoning is instructive because it confirms what the federal statute plainly states, what the FCDO was told years ago when it attempted the same diversion of federal funds in *Wilson v. Horn,* 1997 WL 137343, at *5 (E.D.Pa.1997) (discussed *infra* ), and what *Harbison v. Bell* reaffirmed more recently: federal funds cannot be diverted to pursue the FCDO's private agenda of exhausting claims in state court in advance of federal *habeas* review.

Harbison specifically addressed the situation where federal counsel had been appointed for purposes of a [28 U.S.C.] § 2254 [*i.e.,* state prisoner's federal *habeas* ] claim and the petitioner now requests that the federal counsel pursue his state post-conviction claims. The Court held that, although the state court proceeding is technically "subsequent" to a federal appointment, this situation was not contemplated by [18 U.S.C.] § 3599(e). In the "ordinary course of proceedings for capital defendants," petitioners must exhaust their claims in state court before seeking federal habeas relief. "That state postconviction litigation sometimes follows the

initiation of federal habeas because a petitioner has failed to exhaust does not change the order of proceedings contemplated by the statute." [*Harbison*, 556 U.S.] at 189–90 [129 S.Ct. 1481] (internal citations omitted).

The Supreme Court also provided an exception to its holding. In a footnote, it stated that a district court "may determine on a case-by-case basis that it is appropriate for federal counsel to exhaust a claim in the course of her federal habeas representation." *Id.* at 190, n. 7 129 S.Ct. 1481[ ]. The Court made clear that this exception was not encompassed within the statutory meaning of "available post-conviction process;" instead, it was made possible pursuant to § 3599(e)'s provision that counsel may represent her client in "other appropriate motions and procedures." *Id.*

In Mitchell's case, he is litigating a state postconviction proceeding after federal counsel was appointed to pursue his § 2254 claim. The *Harbison* Court explicitly held that this type of proceeding is not in the ordinary course of "subsequent" available proceedings. The Court's analysis therefore turns on whether it should grant Mitchell's motion insofar as it is an "appropriate motion[ ]" as discussed in the *Harbison* footnote.

*Harbison* did not clarify the circumstances under which the exception should be applied: it states only that a Court may direct federal counsel to exhaust state claims if it determines, "on a case-by-case basis," that it is "appropriate." The Court's decision must stay consistent with the general purpose and reasoning of the *Harbison* decision; and, its exercise of discretion may not permit *Harbison's* footnote exception to swallow its rule. Guided by this reasoning, the Court denies Mitchell's motion.

The Court first considers the fact that state law guarantees counsel for purposes of Mitchell's PCRA appeal.... The Court affords special weight to the fact that, by virtue of state law, Mitchell will be provided court-appointed counsel in his PCRA appeal regardless of this Court's action.

\* \* \*

Mitchell, in contrast [to the habeas petitioner seeking to pursue state clemency proceedings under Tennessee law in *Harbison*], would never be "abandoned" by counsel and left to navigate the PCRA appeal process by himself. If the Court were to deny Mitchell's motion, he would still be entitled, under state law, to counsel who would assist in pursuing his PCRA appeal. It is not "appropriate" for this Court to direct the FCDO to litigate this action in place of a state-appointed counsel....

The Court is also reluctant to order FCDO counsel to pursue Mitchell's claims in state court in light of the case's unique federalism concerns. Unlike the state of Tennessee in *Harbison,* which had taken the position that it held "no real stake in whether an inmate receives federal funding for clemency counsel," the Commonwealth of Pennsylvania has elected to take an adversarial position and has contended that state PCRA appeals should not be covered under § 3599....

The FCDO currently represents Mitchell in its capacity as a nonprofit public defender organization, independent from its federal authorization under § 3599(a)(2). If the Court were to authorize the FCDO, in the scope of its federally funded representation, to litigate Mitchell's case in state court, such an order would "put the district court[ ] in the position of overseeing, and thus indirectly managing, counsel's performance in the state court proceeding." ... Granting the FCDO's Authorization Motion thus raises a set of federalism concerns that are not triggered if the FCDO continued to represent Mitchell in its private capacity.

... The Court cannot read *Harbison* to mean that all petitioners may be excepted out of the Supreme Court's holding by virtue of their procedural posture and the length of delay in their respective courses of litigation.

\* \* \*

The FCDO has not pointed to, and the Court has not independently found, any similarly-situated cases that in-

voked the *Harbison* footnote exception to expand the scope of available representation under § 3599(e). . . .

* * *

In light of these factors, it would not be appropriate for this Court to exercise its discretion to authorize the FCDO to pursue Mitchell's state proceedings within the scope of its federally funded duties. To hold otherwise would allow *Harbison's* footnote exception to swallow its rule.

*Id.* at *4–7.

The second federal pleading in *Mitchell* is the Notice of Removal. *See In Re Proceeding in Which the Commonwealth of Pennsylvania Seeks to Compel,* No. 2:13–cv–01871. Here, the FCDO stated outright that its Motion to Reactivate was designed to "moot" this Court's administrative remand Order. The Notice of Removal said that the FCDO removed the counsel representation question from the PCRA court pursuant to 28 U.S.C. §§ 1442(a) and (d)(1) and 1446(g). Section 1442 provides for removal to federal court of any action directed against a person **acting under an officer or agency of the U.S. government** ("federal officer removal" statute). Section 1446(g) governs the timing of certain removal actions. The FCDO stated that it was removing only the remand proceeding, and not the "underlying action" concerning Mitchell's "conviction and death sentence."

The FCDO then argued that although it is a private entity, it concomitantly acts under a federal officer or agency, per the Criminal Justice Act, 18 U.S.C. § 3006A, which governs the appointment and compensation of lawyers to represent indigent defendants in **federal** proceedings. The FCDO posited that defender organizations are federally funded to assist the federal government in providing representation to indigent defendants in federal criminal proceedings, including *habeas* proceedings involving state prisoners. The FCDO then bootstrapped from this authorized **federal** court role the proposition that it acts under an officer or agency of the U.S. government even when it pursues its private agenda by insert-

ing itself into state capital proceedings in advance of federal review.

In square tension with its multiple representations to this Court that it acts solely in its private capacity when appearing in Pennsylvania state court, the FCDO thus claimed that it is always subject to federal control, providing a service the federal government allegedly otherwise would have to perform, and thus the removal statute is operative. The FCDO asserted that the inquiry this Court directed of officers of the Court in its supervisory capacity implicated "the particulars of the funding relationship between the FCDO and the federal government." The FCDO then argued, in essence, that despite its federal taxpayer subsidy, no entity other than the federal courts has a right to inquire into whether it improperly diverts federal tax money to support a private state court capital agenda: according to the FCDO, the answer to the question of its misappropriation of federal taxpayer funds is a secret.

The third federal motion filed by the FCDO in *Mitchell* was a Motion to Dismiss with prejudice the proceeding it had removed. The FCDO argued that the only body that can address the question of its diversion of federal funds is the AO, since the enforcement of Section 3599 can only be at the request of the AO. The FCDO claimed that any attempt to enforce the provision by a state court somehow frustrates federal law and is therefore preempted. Alternatively, the FCDO asked the district court to stay the proceeding and refer the matter to the AO, which it said has primary jurisdiction to administer funds under the federal program and statutes at issue.

The Commonwealth responded to the Motion to Dismiss and also requested that the case be remanded to Pennsylvania state court. As noted above, the FCDO removed to federal court a number of other capital cases where similar inquiries were underway, and then moved to dismiss them; and the Commonwealth responded along the same lines as it did in *Mitchell*, *i.e.*, seeking remand of this Court's supervisory questions to state court. The federal district courts have split

on the appropriate response: the *Mitchell* case and at least two others filed in the Eastern District resulted in a denial of the Commonwealth's motion to remand and a grant of the FCDO motion to dismiss the action it removed; while three cases removed to the Middle District, and assigned to Judge A. Richard Caputo, resulted in a grant of the Commonwealth's motions to remand. Judge Caputo has catalogued the cases in his memorandum opinion denying the FCDO reconsideration request in the *Sepulveda* removal case, see 2013 WL 5782383, at *1 n. 2 (M.D.Pa. Oct. 25, 2013) (*In Re FCDO (Sepulveda) II* ), and further noting that appeals to the Third Circuit were filed in all of the cases.

Judge Caputo's analysis in his two memorandum opinions in *Sepulveda* is of particular interest, since the FCDO's reconsideration request there was premised upon the FCDO arguments accepted by Judge McLaughlin in the Eastern District cases. In his initial memorandum, Judge Caputo noted that, among other things, the FCDO had to show that it "acts under" a federal officer in order to prove removal jurisdiction under Section 1442(a)(1); and the FCDO's essential position was that, as a federal grantee/contractor under the Criminal Justice Act, it "acts under" the AO even when acting exclusively pursuant to its private agenda in state capital cases. The Commonwealth rejoined that no federal agency is obliged to appear in state court, or to provide legal representation to criminal defendants in state court, and thus the FCDO is not serving the federal government when it represents indigent criminal defendants in state court proceedings that precede federal *habeas* review.

After surveying the relevant statutory and decisional law landscape, Judge Caputo rejected the FCDO's "acting under" federal authority argument, noting:

> The FCDO asserts that it assists the Government by representing indigent defendants, which it suggests is bolstered by the fact that the Guidelines for Administering the Criminal Justice Act and Related Statutes require that a Community Defender Organization's "stated purposes must include implementation of the aims and purposes of the CJA."

However, the FCDO has not identified any federal agency or officer that is tasked with or has a duty to appoint, arrange, or provide legal representation for indigent capital criminal defendants in *state post-conviction proceedings* to preserve claims for federal habeas review. A necessary condition to invoke the federal officer removal statute, the assistance or carrying out of duties of a federal superior, is therefore absent in this case. As a result, even if the FCDO is "acting under" a federal officer in the course of its representation of clients in federal court, it does not follow that it also "act[s] under" a federal officer in its performance of tasks for which the Government bears no responsibility, such as appearing in state postconviction capital proceedings to exhaust claims for federal habeas review.

\* \* \*

Furthermore, [neither] the FCDO's submissions nor its arguments demonstrate that it is in such an unusually close relationship with the AO or the Federal Government to make the federal officer removal statute applicable to this proceeding. The FCDO . . . is subject to guidelines and regulations including the terms of its funding grant. But the FCDO has not suggested that its representation of clients is performed at the direction of the AO, that the AO dictates its litigation strategies or legal theories in individual cases, that the AO reviews its work product, or that the AO otherwise takes an active role in monitoring and/or participating in client representation. Of course, a third-party cannot dictate the FCDO's legal representation of its clients. . . . Nonetheless, it is this lack of monitoring or close supervision that distinguishes the relationship between the FCDO and the AO from cases that have found an unusually close relationship between a private contractor and a federal officer or agency for purposes of § 1442(a)(1). . . .

\* \* \*

Here, . . . for the reasons detailed above, the FCDO is not providing a service the Government "needs" when it represents criminal defendants in state post-conviction proceed-

ings prior to federal habeas review. Nor in the absence of the FCDO would the Government be obligated to provide representation itself in such circumstances. Accordingly, there is no unusually close relationship between the FCDO and the Federal Government, and removal of the Disqualification Proceeding was improper.

*In Re FCDO (Sepulveda)*, 2013 WL 4459005 at **12–14 (citations omitted; italics in original).

Judge Caputo elaborated on his reasoning in the memorandum he filed in response to the FCDO's reconsideration motion in *In Re FCDO (Sepulveda) II*. Judge Caputo directly responded to an FCDO argument on reconsideration premised upon what the FCDO had successfully argued in the Eastern District, as follows:

[T]he FCDO maintains that "[w]hen in the setting of a PCRA proceeding the FCDO investigates and researches federal claims . . . it is surely 'related to' the federal habeas representation." . . . The FCDO further contends that "the research and investigation of federal claims undertaken in the PCRA proceeding is work that is essential to the preparation of the eventual federal habeas petition. . . . [Thus,] 'the aspect of its state court representation that is done in preparation of the federal habeas petition is permitted by § 3599, and is performed 'under color' of a federal office.' "

First, I find no merit in the FCDO's claim that its federal contract constitutes an act under a federal officer. The federal contract is the source of the FCDO's relationship with the Federal Government, not an act under color of office.

Second, I am not convinced that the investigation and research of federal claims in Mr. Sepulveda's PCRA cases as preparation for federal habeas review occurred "under color" of federal office. Participation in the state proceeding is not necessary to preparation for the federal proceeding. Moreover, if deemed important, the FCDO can review the state filings to determine the issues raised therein and research and prepare in anticipation of them in the federal

proceeding. Here again the requirements merge. It is not something the Federal Government provides and to argue it is related because it is the same or similar to the federal proceeding is suggesting too broad an application of "relating to." Parallel proceedings in federal and state courts while dealing with similar issues does not satisfy the "relating to" and therefore the "under color" of federal office criterion.

\* \* \*

A prior submission by the FCDO buttresses this conclusion [i.e., that the FCDO's state court activities are not derived solely from its official duties]. The FCDO states: "FCDO attorneys also appear on behalf of some of their federal clients in PCRA proceedings in Pennsylvania courts. They do so either on the authority of a federal court order to exhaust their client's state court remedies or as Pennsylvania-barred lawyers appointed by the PCRA court or retained by the defendant to represent him on a pro bono basis." ... Here, prior to appearing in the PCRA proceeding, the FCDO did not obtain a federal court order appointing it as counsel to exhaust Mr. Sepulveda's claims in state court. Essentially, the FCDO, on its own, undertook the representation of Mr. Sepulveda in his PCRA proceeding. As a result, the action the Commonwealth challenges, the FCDO's representation of a PCRA petitioner in state court, did not naturally "occur[ ] during the performance of [its] government-specified duties," ... nor result from its execution of its contract. . . .

2013 WL 5782383, at \*\*5–7.[14]

6. *Another FCDO Account of its Authority and Funding*

In a recent direct capital appeal, *Commonwealth v. Sanchez,* 623 Pa. 253, 82 A.3d 943 (2013), I filed a concurring opinion

---

**14.** The Third Circuit's calendar, available on its website, reveals that six FCDO removal cases were argued in the Third Circuit on June 25, 2014. As I will explain below, irrespective of how the Circuit ultimately rules on removal-and-dismissal of a supervisory inquiry into the FCDO's candor to this Court concerning its diversion of federal funding because the FCDO is supposedly "acting under" a "federal officer"

which quoted the FCDO's representations at a remand hearing held to ascertain the FCDO's authority to continue to represent Sanchez on his direct appeal:

At the hearing, Rebecca Blaskey, the First Assistant to the Federal Defender, explained the FCDO's authority to represent appellant as follows:

Ms. Blaskey: Your honor, the Federal Community Defender Office is not authorized or permitted to expend federal funds in state court proceedings except under very limited circumstance [sic], and arguably, a direct appeal proceeding such as this one would not qualify. So as the Federal Community Defender, Your Honor, we are not able to accept appointment in Mr. Sanchez's cases [sic].

The Court: What is the authorization for the Federal Community Defender's Office? What is their scope of representation?

Ms. Blaskey: Your Honor, we represent persons—as the Capital Habeas Unit, we represent death sentenced prisoners in [18 U.S.C. § ] 2254 proceedings in Federal Court, some ancillary proceedings in State Court, and we also present [sic] some [18 U.S.C. § ] 2255 Federal prisoners. We are funded by a grant from the Administrative Office of the United States Courts in Washington D.C., and as such, it [sic] cannot expend federal money in state court proceedings except under limited authorized circumstances.

The Court: You may continue.

Ms. Blaskey: Thank you, Your Honor.

One of the things that I had explained to Your Honor was that, previously, was that the Defender Association of Philadelphia, which is our umbrella organization, has as part of its entity the Pennsylvania Capital Representation Project, which is a non-profit project that does not use federal funds, and if Your Honor would like to appoint our

when it pursues a private agenda in a court system where the federal government has no obligation, this Court retains the supervisory power to remove the FCDO from cases.

lawyers, what we would request is that Your Honor appoint the Pennsylvania Capital Representation Project rather than the Federal Community Defender.

The Court: Are the lawyers one and the same for both?

Ms. Blaskey: They are, Your Honor.

The Court: And what is the funding of the Pennsylvania Capital Representation Project?

Ms. Blaskey: Your Honor, that is a non-profit 501–C3, and it's funded by private donations and grants.

The Court: And accepting your statement as an officer of the court, they are authorized to represent capital defendants in state court proceedings?

Ms. Blaskey: Yes, Your Honor.

Primarily, as the name implies, we represent capital defendants in post-conviction proceedings. Since this is a direct appeal proceeding, if Your Honor were to appoint us, we could accept that as the Pennsylvania Capital Representation Project.

82 A.3d at 996–97 (Castille, C.J., concurring), quoting Petition to Withdraw as Counsel/Appointment of New Counsel Hearing, 6/21/2010, at 3–5.

With this background in mind, I proceed to discuss the pending Motions.

### III. Motion for Recusal from Reargument

The FCDO argues that my recusal is "required" not because of anything relating to appellant's cause or appeal, but because my Concurring Opinion commented upon the conduct of FCDO lawyers. The Motion says recusal is required because I "attacked" the "integrity, ethics and methods" of the FCDO. The Motion thus echoes other recusal motions the FCDO has filed, which confuse the dubious conduct of FCDO attorneys with the cause of their clients, and suggest that ethically questionable FCDO conduct, if commented upon by a jurist, requires removal of the jurist rather than, for example, better conduct by, or removal of, the FCDO as counsel. It is a strange position to maintain when the FCDO is neither appointed nor retained, but simply enters Pennsylvania capital cases as part of a pervasive private agenda. I have addressed

the central theory before, most recently in my recusal Opinion in *Commonwealth v. Porter*, 613 Pa. 510, 35 A.3d 4, 29–33 (2012).

The Commonwealth responds by noting that the observations in my Concurring Opinion "were not intemperate, unjustified, indiscriminate or made extrajudicially in the media. Rather they directly reflect the misconduct of counsel for the defendant." The Commonwealth also notes that the Motion ignores that another member of the Court, Mr. Justice McCaffery, joined my Concurring Opinion; a second Justice joined Part II of the Concurring Opinion, which proposed remedial briefing restrictions in light of the FCDO's rampant abuses; a third Justice suggested that FCDO counsel be reported to the Disciplinary Board; and a majority of the Court joined Justice McCaffery's Majority Opinion, which found multiple arguments raised by the FCDO on appeal to be frivolous. The Commonwealth notes that the FCDO "cannot engage in this type of behavior without reasonably expecting observation or consequence by the Court" and the FCDO "should not be rewarded with recusal for engaging in conduct designed to induce a motion for recusal."

In the subsequent Withdrawal pleading, the FCDO does not address recusal specifically. Instead, the FCDO claims that (1) appellant's primary concern is with resolution of his reargument application, and (2) "counsel deems withdrawal to be appropriate under all the circumstances."

The FCDO Withdrawal pleading, construed as an Application for Relief seeking leave to withdraw the prior Motions, is **granted** as to the **Motion for Recusal from Reargument.** No recusal Motion remaining before the Court, I have participated in the Court's unanimous decision to deny reargument.

### IV. *Motion for Withdrawal of Concurring Opinion*

*Withdrawal of Motion for Withdrawal*
*of Concurring Opinion*

*(Construed as Motion for Leave to Withdraw)*

The FCDO's attempt to withdraw its Motion for Withdrawal of the Concurring Opinion is more problematic. As the

Court's *per curiam* Order of October 3, 2011, noted, the Withdrawal pleading includes argument, disputing the Court's July 28, 2011 *per curiam* Order, which the FCDO had simply violated. Specifically, the Withdrawal pleading argues that the FCDO is authorized to engage in state capital PCRA litigation in advance of federal *habeas corpus* proceedings in order to exhaust federal *habeas* claims. The pleading further declares that the FCDO's state court exhaustion activities are authorized under 18 U.S.C. § 3006A(c), which permits appointed federal counsel to represent clients in ancillary matters "appropriate to the proceedings." As noted above, this interpretation of the governing federal statute is abjectly mistaken, and indeed is contradicted by the FCDO's later account of the statute in its Verified Statement—ancillary matters cannot precede federal *habeas* review, and so litigation of a first PCRA petition cannot properly be ancillary to a federal court appointment for *habeas* purposes.

The Withdrawal pleading next declares that the FCDO disagrees with the Court's determination that the information the FCDO was directed to provide in the Verified Statement, concerning its activity in Pennsylvania state courts, was necessary to evaluate the FCDO's ancillary motions. The pleading argues that the attempted withdrawal, without leave of Court, "renders the matter moot." In support, the FCDO claims that no case or controversy remains and, in a further collateral attack upon the Court's July 28 Order, cites the minority view in Justice Todd's Dissenting Statement. Finally, the FCDO collaterally attacks the Court's July 28 Order by arguing that, even though it was withdrawing its prior Motions, the Court should vacate its order on mootness grounds.

The Commonwealth responds by disputing the FCDO's predicate assumption that it has the power to unilaterally withdraw Motions this Court took under advisement and addressed in our *per curiam* Order. The Commonwealth argues that withdrawal of the FCDO's motion will not put an end to the FCDO's demonstrated abusive litigation tactics in state courts; withdrawal of the FCDO from unauthorized state court litigation is the only way to eliminate those ongoing

abuses. In addition, the Commonwealth notes that the FCDO's opinion that withdrawal is "appropriate" is immaterial, since that question is for the Court; and, in any event, the Commonwealth does not withdraw its Motion for Sanctions, which is premised upon the FCDO's two ancillary Motions being frivolous. Respecting the FCDO's disputation of the propriety of the July 28 order, the Commonwealth notes the FCDO's failure to request reconsideration or a stay, and its choice instead to violate the Order and file a "Withdrawal" which "stat[ed] that this Honorable Court's order is wrong and that they do not wish to litigate why." Respecting the FCDO's mootness assertion and its request to vacate the Order, the Commonwealth again notes the pendency of its Motion for Sanctions. The Commonwealth adds that the FCDO's Motions, which are frivolous, nevertheless required the Commonwealth to expend time and money to prepare replies.

The Commonwealth also challenges substantive arguments in the FCDO's Withdrawal pleading. The Commonwealth's argument anticipates the view of the federal restrictions eventually acknowledged by Attorney Skipper in his subsequently-filed Verified Statement, because it is the only plausible view: *i.e.*, the FCDO is not authorized, by virtue an appointment in federal *habeas* matters, to litigate capital PCRA petitions and appeals in advance of federal *habeas* under a federal statute allowing for appointment to pursue matters "ancillary" to federal *habeas* proceedings. The Commonwealth, like the FCDO and Judge McLaughlin, also identifies *Harbison v. Bell* as controlling, since *Harbison* held that the proper interplay of state collateral review and federal *habeas* review of state convictions means that federal *habeas* appointment and representation is appropriate only after state proceedings have concluded. Thus, Section 3599(e) only authorizes "federally funded counsel" to "represent her client in 'subsequent' stages of available judicial proceedings." The *Harbison* Court emphasized:

> State habeas is not a stage "subsequent" to federal habeas.
> Just the opposite: Petitioners must exhaust their claims in

state court before seeking federal habeas relief. See [28 U.S.C.] § 2254(b)(1). That state postconviction litigation sometimes follows the initiation of federal habeas because a petitioner has failed to exhaust does not change the order of proceedings contemplated by the statute. FN7

FN7. Pursuant to § 3599(e)'s provision that counsel may represent her client in "other appropriate motions and procedures," a district court may determine on a case-by-case basis that it is appropriate for federal counsel to exhaust a claim in the course of her federal habeas representation. This is not the same as classifying state habeas proceedings as "available post-conviction process" within the meaning of the statute.

556 U.S. at 189–90 & n. 7, 129 S.Ct. 1481.

The Commonwealth adds that the FCDO's description of a more expansive statutory authority in its Withdrawal pleading—a position the FCDO has now apparently reprised in the cases it removed to federal court—was rejected by the U.S. District Court for the Eastern District of Pennsylvania 17 years ago, in a memorandum decision in *Wilson v. Horn,* 1997 WL 137343, at *5 (E.D.Pa.1997), which held: "[A] motion for appointment of counsel filed under [the former version of Section 3599], before state *habeas* proceedings have been completed, does not permit qualified federally appointed counsel to represent a client in state *habeas* proceedings at federal expense. Federal jurisdiction may not be invoked as a shell to trigger federal funding of state *habeas* proceedings." The Commonwealth notes that appellant's PCRA appeal counsel, FCDO Attorney Dunham, was the lawyer who pursued and lost the shell-game argument in *Wilson.* In its relief paragraph, the Commonwealth requests a Rule to Show Cause requiring the FCDO to explain why it should not be held in contempt for flouting the Court's July 28 order.

The FCDO cites no authority for its assumption that it can unilaterally withdraw pending Motions this Court has taken under advisement and acted upon, or for its related assumption that it may ignore the Order of the Court acting upon those Motions. In addition, the Withdrawal pleading contains argument disputing the Court's authority and addressing the FCDO's authority to appear in state court, and it requests

relief from the Order. Furthermore, according to the FCDO itself (in opposing the Commonwealth's initial request for sanctions), its Motions "raise legitimate points for consideration." Answer to Motion for Sanctions, 4.

The question of whether the Court should direct an administrative accounting of the FCDO's activities in Pennsylvania state courts and its authority to appear in our courts in order to dispose of the FCDO's initial ancillary Motions was resolved by the July 28 *per curiam* order, which became final once the FCDO did not seek reconsideration. FCDO counsel was ordered to provide the information necessary to determine the FCDO's Motions and the Commonwealth's responsive Motion seeking sanctions. It is not for a litigant or his attorney to say whether a Court order is "necessary" or whether a matter, taken under advisement by the Court, has become moot, or whether counsel's slant on mootness authorizes and allows counsel to defy an unambiguous Court order. In addition, the FCDO's mootness argument was mistaken since it ignored the Commonwealth's responsive Motion for Sanctions.

Under the circumstances, there is no basis to allow the FCDO to withdraw the Motion to Withdraw Concurring Opinion, as of right. Nor, construing the Withdrawal pleading as a request for leave to withdraw, has good cause (or any cause) been shown to grant such a request. The Motion to Withdraw made very serious allegations concerning the propriety and accuracy of my Concurring Opinion, and made definitive material assertions of fact in support of the allegations. As the FCDO itself admitted, the subject concerned an important issue: the propriety of the FCDO's pervasive conduct and agenda in Pennsylvania capital cases. Notably, the FCDO's initial allegations went uncorrected in its Withdrawal pleading, and those claims remain uncorrected, except for Attorney Skipper's non-case-specific admission that Attorney Wiseman's prior representation that the FCDO was in full compliance with federal rules and regulations was untrue. The Withdrawal pleading served other purposes, while disputing the *per curiam* Order the FCDO had ignored, and seeking its *vacatur.*

Furthermore, Attorney Skipper's Verified Statement validates the Concurring Opinion's concerns with the propriety of the FCDO's use of federal taxpayer funding to support its pervasive private agenda in state capital proceedings—including in this case. The Verified Statement also raises concerns with the accuracy of averments in the Withdrawal pleading, since the account of the FCDO's statutory authority and state court conduct related in the Verified Statement is materially different from the account of the FCDO's "ancillary" authority and state court conduct alleged in the Withdrawal Motion, and the latest, shifting FCDO account is different still from Attorney's Wiseman's initial account respecting the FCDO's conduct in Pennsylvania capital cases. The Withdrawal pleading also was filed only after a significant commitment of the Court's resources. Finally, the Commonwealth was put to the time and expense of formulating responses and its resulting Motion for Sanctions was not negated by the FCDO's violation of the Court's order and its strategic filing.

For these reasons, the "Withdrawal" pleading of August 22, 2011, construed as an Application for Relief seeking leave to withdraw the prior Motions, is **denied** as to the **Motion to Withdraw Concurring Opinion,** and I will now proceed to dispose of that Motion on the merits.

## V. Motion to Withdraw Concurring Opinion (FCDO Procedural Claims)

### A. *Full Court Referral*

In the title of its Motion, the FCDO adverts to referral to the full Court, but the FCDO makes no further reference or supporting argument in the actual Motion itself. The request is subject to denial on that ground alone. I will not burden the Court with a referral of my own accord, given both the striking number of frivolous arguments in the Motion, and its overall obvious lack of merit.

### B. *Supreme Court Internal Operating Procedures (IOPs)*

The FCDO first alleges that withdrawal of my Concurring Opinion is required because it "is not a proper concurring

opinion" under Section 4(B)(2) of the Court's IOPs.[15] The FCDO cites the IOP "definition" of a concurring opinion and then alleges that, because my Concurring Opinion joined the Majority Opinion, it must be withdrawn. Motion, 1, 29. The Commonwealth responds that the FCDO misreads the IOPs, which create no substantive or procedural rights; that the Rules of Appellate Procedure do not permit the relief the FCDO seeks; and the FCDO cites no authority supporting the relief it seeks. The Commonwealth is correct; this FCDO argument is frivolous.

The FCDO misapprehends the text and purpose of the IOPs. First, as the Commonwealth notes, the FCDO fails to acknowledge IOP Section 1, which provides: "This manual of internal operating procedures is intended to implement Article V of the Constitution of Pennsylvania, statutory provisions, the Pennsylvania Rules of Appellate Procedure and the customs and traditions of this Court. No substantive or procedural rights are created, nor are any such rights diminished." The IOPs create no rights. Second, nothing in the customs and traditions reflected in the IOPs purports to discourage, much less ban, joining concurrences. Indeed, Section 4(B) of the IOPs, the only subsection the FCDO cites, addresses only the "labeling" of opinions; it does not address or restrict the filing of opinions. Third, what the FCDO calls a subsection "defining" a "concurring opinion" in fact is a provision that is merely entitled "Concurrences and Dissents." The subsection discusses and distinguishes the variety of responsive opinions premised upon the positions of the expressions with respect to the overall mandate; the subsection does not purport to ban responsive opinions, much less does it ban joining concurrences. Finally, the FCDO's argument also misreads the select portion of the IOP it quotes: "An opinion is a 'concurring opinion' when it agrees with the result of the lead opinion. A Justice who agrees with the result of the lead opinion, but does not agree with the rationale supporting the lead opinion, in whole or in part, may write a separate 'concurring opin-

---

15. The Court has since amended the IOPs, effective February 8, 2013. The new IOPs make no material alterations to the provisions at issue.

ion.' " This provision merely records the Court's "custom and tradition" that a "concurring opinion" is one that "agrees with the result of the lead opinion," which my Concurring Opinion expressly did. There are other types of concurrences, which do not agree with the lead opinion's reasoning—hence the second sentence—but, they are not the only customary concurrences.[16]

The FCDO notion of "banning" joining concurrences is ludicrous; indeed, such opinions are common.[17] Justice Samuel A. Alito's concurrence to the *per curiam* opinion in *Bobby v. Van Hook*, 558 U.S. 4, 13–14, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), respecting the limited relevance of the American Bar Association ("ABA") guidelines for defense counsel in capital cases, which I further discuss below, was a joining concurrence. Likewise, the Court's decision two years ago in *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), concerning the constitutionality of mandatory life sentences without the possibility of parole for juvenile murderers, included a concurrence by Justice Stephen Breyer, joined by Justice Sonia Sotomayor, which began by stating, as my Concurring Opinion did, that he joined the Court's opinion "in full."

The FCDO request to withdraw my Concurring Opinion, based upon a misapprehension and misrepresentation of the Court's IOPs, is dismissed as frivolous. Under no construction of the IOPs is withdrawal of an opinion required or authorized on the grounds the FCDO states; and nothing in

16. Indeed, there is nothing in the IOPs, or logic, to prevent the author of a majority opinion from filing a separate concurring expression. *See, e.g., Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 633 & n. 1 (2012) (Saylor, J., specially concurring in case where Mr. Justice Saylor authored majority opinion; citing examples of similar expressions).

17. A law review article by the Honorable Diane P. Wood, Judge of the U.S. Court of Appeals for the Seventh Circuit, describes the various types of responsive opinions available to appellate judges, and the purposes they serve. *See* Diane P. Wood, *When to Hold, When to Fold, and When to Reshuffle: The Art of Decisionmaking on a MultiMember Court*, 100 Cal. L.Rev. 1445 (2012). My Concurring Opinion fits squarely within the tradition described in Judge Wood's article.

the IOPs can remotely be read as taking the nonsensical position of forbidding a joining concurrence.[18]

## VI. The Merits—FCDO Substantive Claims

### A. *Alleged Unwarranted and Unfounded Accusations in Concurrence*

Turning to its "merits" argument, the FCDO claims that my Concurring Opinion should be withdrawn because it makes "unwarranted and unfounded accusations against the FCDO." The FCDO identifies three sub-points to this claim: (a) the Concurring Opinion allegedly reveals "misperceptions about the role and responsibility of capital post-conviction counsel"; (b) the Concurring Opinion allegedly makes unfounded assertions about particular actions taken by the FCDO; and (c) the Concurring Opinion allegedly was "incorrect" to suggest that the FCDO may be misusing federal funds to support its state court capital agenda because, in fact, "the FCDO 'is in full compliance with applicable administrative rules and regulations and has a separate source of funding to support its [litigation in] state court.'" Motion, 2–3 (citation omitted). I will address the third argument first because the FCDO does so, and because the assertion that my Concurring Opinion was incorrect on this point was the subject of this Court's Orders of July 28 and October 3, and Attorney Skipper's Verified Statement. I have already explained the particulars of the FCDO's claim that I was incorrect and the content of the Court's responsive Orders; I have explained the Commonwealth's response; I have summarized and analyzed the contents of the Verified Statement; and I have summarized other matters bearing upon the question of the FCDO's authorization to pursue its private capital agenda in state court, and the propriety of diverting federal funding to support the agenda.

18. Later in its Motion, in discussing frivolous claims, the FCDO posits that " 'frivolous' is often in the eye of the beholder." Motion, 6, 7. The FCDO is wrong. The measure of what is frivolous is objective. *See, e.g.,* Pa. R. Prof. Conduct 3.1 (Explanatory Comment) (comparing Pennsylvania Rules to Code of Professional Responsibility). An argument, such as the one in text, which misapprehends or misrepresents the only authority cited, is frivolous.

1. *FCDO's Misuse of Federal Funds to Litigate in State Court*

The Verified Statement admits that Attorney Wiseman's initial, unqualified representation that FCDO activities in state court were in full compliance with federal restrictions was false.[19] The FCDO admits that its "allocation of costs" in unidentified prior cases violated federal administrative rules and regulations. Again, the FCDO does not provide the relevant rules and regulations, identify the cases where the violations occurred, or describe the nature and extent of the violations. In addition, as I have described above, the FCDO has resisted any inquiry into the particulars of its funding, in a series of cases it has removed to federal court, delaying countless Pennsylvania capital matters where its only involvement is as a consequence of its private death penalty agenda, and the delay is a direct product of that agenda.

The FCDO's war on its ethical duty of candor to the Court aside, the fact remains that, as I have also carefully explained above, the averments in the Verified Statement convey that the FCDO's diversion of federal grant funds to finance and pursue its private agenda in Pennsylvania state courts in capital cases has been pervasive and continuing, and embraces its commitment of extensive resources to abusively litigate this capital case both at the trial level and on appeal.

It is apparent that the FCDO long ago decided that it would divert federal funds to exhaust claims in initial PCRA petitions in capital cases, in advance of litigation of federal *habeas corpus* petitions, and without federal court authorization. This activity occurred (and presumably continues to occur, given the averments made in the Verified Statement) notwithstanding the FCDO's eventual concession that it cannot properly devote federal grant funds to state court litigation absent federal court appointment for that specific purpose, and only

**19.** The initial averment of full compliance quoted from an identical averment the FCDO made in *Commonwealth v. Hill,* 609 Pa. 410, 16 A.3d 484, 490 (2011). The averment in Hill, made by the FCDO in specific response to the Commonwealth's questioning the propriety of the FCDO's state court foray in that case, is no less problematic a misrepresentation to the Court.

in matters subsequent and ancillary to actual litigation of a federal *habeas* petition. This means that federal funding cannot be employed by a private entity like the FCDO to pursue its private agenda to "exhaust" claims in first capital PCRA petitions, since these are matters which, by definition, are litigated in advance of federal *habeas* review. *Harbison*, 556 U.S. at 189–90, 129 S.Ct. 1481. The FCDO's activity also occurred notwithstanding that, as noted *supra*, a federal district court long ago specifically rejected its erroneous theory that federal *habeas* jurisdiction could be employed as a shell to trigger the expenditure of federal funds. *Wilson v. Horn*, 1997 WL 137343, at *5 (E.D.Pa.1997).

In my Concurring Opinion, I noted that the scope of the federal resources "deployed here, not to ensure a fair trial, but to try to prove that a presumptively competent trial lawyer was incompetent, is simply perverse." I noted that, in this collateral proceeding (involving but one of the defendant's three capital murder convictions), the FCDO "devoted, at a minimum, five lawyers, an investigator, multiple mitigation specialists, and multiple experts to the project. It inundated the PCRA court with prolix pleadings, including trivial and frivolous claims intermixed with more serious issues; it deployed multiple lawyers at hearings, who then attempted to conduct multiple and redundant examinations." I further noted that the commitment of manpower alone was "beyond remarkable." I also described the heavy burden on this Court arising from the abusive Brief the FCDO filed in this Court. *Spotz*, 18 A.3d at 332–33 (Castille, C.J., concurring, joined by McCaffery, J.).[20]

20. The California Supreme Court, citing my Concurring Opinion, has recognized that abusive pleadings and briefs in capital *habeas* cases in that forum "have created a significant threat to our capacity to timely and fairly adjudicate such matters," and has taken corrective measures. *In re Reno*, 55 Cal.4th 428, 146 Cal.Rptr.3d 297, 283 P.3d 1181, 1246 (2012) (addressing serial petitions). The *Reno* court added:

Some death row inmates with meritorious legal claims may languish in prison for years waiting for this court's review while we evaluate petitions raising dozens or even hundreds of frivolous and untimely claims. We are not the only state court of last resort concerned that abusive exhaustion petitions threaten the court's ability to function.

As noted, the FCDO initially responded through Attorney Wiseman, claiming that, leaving aside the delay and obstruction arising from its commitment of resources and manner of litigating this case, I was incorrect to suggest that there was an issue respecting federalism because, according to Attorney Wiseman, the FCDO financed this extensive litigation, and indeed financed **all** of its state court capital PCRA litigation, with purely private funds. The Verified Statement now admits that Attorney Wiseman's representation was false. In fact, there is nothing in the Verified Statement that calls into question the accuracy of my observations concerning the propriety and effect of the commitment of **federal** resources, derived from taxpayer revenue, to fund this sort of activity. Indeed, if anything, the situation is far more troubling. This is so because the FCDO's averment that its activities here were properly ancillary to orders issued by Judge Munley— which implies that it legitimately supported its obstructionist foray here with federal funds—is mistaken. This fact, in turn, places the FCDO's refusal to show that it has not misused federal funds in this case, or in other capital PCRA matters, in a more revealing light.

As I noted at the outset of this Opinion, the FCDO, obviously employing federal funds, has made itself into the *de facto* statewide capital defender, involving itself without court appointment or approval in a vast number of capital PCRA matters. In that self-appointing role, it insists, it is answerable to no Pennsylvania authority—not even to this Court, which supervises the practice of law, and has a special role in capital cases. The vast number of first petition capital PCRA matters in which the FCDO has involved itself, the restrictions of federal law concerning the use of federal funding, the FCDO's initial, mistaken averments respecting what comprises proper activity "ancillary" to federal *habeas* appointments,

(*See Commonwealth of Pa. v. Spotz* (2011), 610 Pa. 17, 171, 18 A.3d 244, 336 (conc. opn. of Castille, C.J.) [estimating that the time required to evaluate an abusive postconviction petition in capital cases renders the Pa. Supreme Ct. "unable to accept and review about five discretionary appeals"].).
*Id.* at 1246–47.

and the reported statement of the President of the Defender Association all indicate that the FCDO's diversion of federal funding has been deliberate, calculated, substantial and long-standing—and all in support of what can only be described as its private "agenda." Whatever the specifics may be, the FCDO's claim that my Concurring Opinion should be withdrawn because I was "incorrect" respecting the FCDO's misuse of federal tax dollars is frivolous.[21]

The FCDO's latest averments to this Court portray it as a hybrid organization which may appear at will to pursue its private agenda in capital cases in Pennsylvania state courts, so long as it uses only private grant money to do so. In practice, as the Verified Statement admits, the FCDO has not properly managed this supposedly AO-approved hybrid arrangement; instead, its activities here, including the severe negative effects my Concurring Opinion described, were supported by a diversion of federal funding, a diversion not approved by any authority the FCDO has identified, or can identify. Moreover, the FCDO most recently sings a different tune in federal court—one which echoes the claim of the President of the Defender Association and Attorney Skipper's initial claim that the organization in fact has been subsidizing its private state court anti-death penalty agenda with a diversion of federal grant funds all these years, in order to exhaust the claims of possible, future federal *habeas* clients. Irrespective of the FCDO song of the day, the tune remains the same: the FCDO's pervasive activities in Pennsylvania capital cases have advanced the private group's agenda.

### 2. Alleged Misperceptions about the Role of Capital PCRA Defense Counsel

The FCDO's claim that my Concurring Opinion misperceives the role of capital PCRA defense counsel embraces a number of sub-arguments. Specifically, the FCDO takes issue

21. In terms of the FCDO's continuing lack of candor, it bears repeating that the FCDO's Withdrawal pleading was not premised upon taking responsibility and admitting that this particular argument derived from Attorney Wiseman's central factual misrepresentation—a misrepresentation the FCDO has made to the Court before. *See Hill, supra.*

with my comments on: the prolix and frivolous claims raised in its appeal Brief here and the commitment of federal resources to litigate the PCRA matter below; the burden the FCDO's litigation agenda in capital cases places upon Pennsylvania courts; and the delays caused by the FCDO agenda. Respecting the sheer number of claims raised and its commitment of resources, the FCDO cites primarily to the "Guidelines" of the American Bar Association ("ABA") as reported in a 2003 law review article. From this purported authority, the FCDO derives the central proposition that capital PCRA counsel on appeal are ethically required to litigate "all issues" counsel deem "arguably meritorious"—even if those claims were "previously presented." Motion, 5. On the question of the bedrock ethical prohibition against raising frivolous claims, the FCDO cavalierly declares that " 'frivolous' is often in the eye of the beholder." Respecting this case, the FCDO asserts that the 70–plus claims and sub-claims it raised in its Brief "meet both the 'arguably meritorious' standard of the ABA Guidelines, and the standard of the Pennsylvania Rules of Professional Conduct, *i.e.*, that a lawyer not raise a claim 'unless there is a basis in law or fact for doing so that is not frivolous, *which includes a good faith argument for an extension, modification or reversal of existing law.*'" Motion, 7 (emphasis by FCDO). On the question of delays, the FCDO says that its tactics are not part of a strategy of delay, but rather, always derive from its estimation of the needs of individual clients.

Before turning to these individual objections, it bears noting that any evaluation of these arguments for withdrawal is affected by the fact that the FCDO forwards them in a pleading that claimed that its state court activities were supported exclusively by private funds, a claim the FCDO has since admitted was erroneous. Again, my Concurring Opinion did not merely describe the FCDO's Brief and its extensive commitment of resources in this case, but did so in the context of a discussion of the propriety of a commitment of federal taxpayer dollars to support the sort of abusive litigation effort and tactics employed here and in other cases where the FCDO

314

acts pursuant to its private agenda. The federalism context for the concerns I addressed remain, therefore, irrespective of the FCDO's current objections to my commentary on its conduct.

### A. - Delays Caused by the FCDO -

Remarkably, the FCDO forwards its objection to my commentary on its role in creating delay in capital PCRA matters without once addressing, or attempting to defend, the global federal motion it filed in *Commonwealth v. Dougherty,* 495 CAP. That federal motion, among other things, complained of delays in Pennsylvania capital cases, falsely claimed that the "inordinate delays" were the fault of the Pennsylvania Supreme Court, and baselessly accused the Court of being "incapable of managing its capital docket." The requested relief was to allow Dougherty to bypass the Supreme Court altogether. In forwarding that broad accusation embracing all Pennsylvania capital cases, the FCDO failed to acknowledge its own deliberate role in delaying innumerable capital cases, including cases the FCDO specifically listed in the federal motion as its "proof" of the Court's supposed ineptitude. Thus, my discussion of delays caused by the FCDO occurred in the context of a discussion of the blatant misrepresentations the FCDO made in *Dougherty,* as well as the gratuitous burdens placed upon the Court by abusive briefs like the one the FCDO deliberately filed in this case-burdens which necessarily delay all other matters, capital and non-capital. *See In re Reno,* 55 Cal.4th 428, 146 Cal.Rptr.3d 297, 283 P.3d 1181, 1246–47 (2012). My discussion of multiple cases where FCDO litigation strategies unquestionably caused substantial PCRA delay was precise, detailed, and accurate.

Parenthetically, as I noted at the outset of this Opinion, I am not the only jurist to comment upon the substantial delays that result once the FCDO puts its private agenda into motion. One of the cases discussed in my Concurring Opinion, respecting FCDO delay tactics, was *Commonwealth v. Abdul–Salaam,* 606 Pa. 214, 996 A.2d 482 (2010). After yet another FCDO state court delay in that case, *see Common-*

*wealth v. Abdul–Salaam,* 615 Pa. 297, 42 A.3d 983 (2012) (*per curiam* decision on third PCRA petition), Abdul–Salaam finally proceeded to a merits disposition of his federal *habeas* petition, and Judge Jones of the Middle District noted the delay caused by Abdul–Salaam's lawyers, who "are at bottom gaming a system and erecting roadblocks in aid of a singular goal—keeping Abdul–Salaam from being put to death. The result has been the meandering and even bizarre course this case has followed. Its time on our docket has spanned nearly all of our service as a federal judge—almost twelve years." *Abdul–Salaam v. Beard,* 2014 WL 1653208, at *78. The attorneys of record in *Abdul–Salaam v. Beard* are the FCDO and Michael Wiseman. Abdul–Salaam's judgment of sentence became final in 1996; the FCDO or its predecessor organization has since represented Abdul–Salaam on three PCRA petitions, two preceding the FCDO being appointed for federal *habeas* purposes, and all causing substantial delay.

Another point respecting Abdul–Salaam's federal *habeas* petition warrants mention, since it is of a kind with the false accusations and tactics used by the FCDO in *Dougherty.* The trial prosecutor in *Abdul–Salaam* was J. Michael Eakin, who was later elected a Justice of this Court (and has never participated in any appeal involving Abdul–Salaam). The FCDO took the bald fact of Justice Eakin's former service as a prosecutor and conjured a scurrilous accusation that, in denying relief on a *Brady* claim [22] on Abdul–Salaam's first PCRA appeal, the Pennsylvania Supreme Court sought only to shield Justice-elect Eakin; that, in rejecting the FCDO's later attempts to relitigate the same basic claim, we demonstrated a bias against the FCDO and its "client"; and, as a result, no federal court deference was due to this Court's decisions. Judge Jones summarily rejected the FCDO's attempt to negate the role of this Court, noting: "All of these speculative assertions relative to bias are meritless. Abdul–Salaam and his counsel's suggestion that the Pennsylvania Supreme Court was anything but professional and unbiased in its review and

22. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

disposition of the issues is without foundation and in no way a justification for bypassing AEDPA [Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2241(d) ] review of the state court decision at hand." *Abdul–Salaam v. Beard,* 2014 WL 1653208, at *23. In the beholding eye of the FCDO, the abject baselessness of a claim is no reason not to invent and pursue it.

The FCDO's current complaint about my discussion of its delay tactics addresses cases in isolation, in an attempt to justify its substantial delay in each case. But, that FCDO quibbling, of course, begs the relevant point: whether lengthy delays in individual cases were "justified" from the perspective of the FCDO private agenda or not, the FCDO's strategy and tactics unquestionably were the **cause** of the delays—not this Court's alleged incompetence or dereliction, as the FCDO scurrilously alleged in *Dougherty.* No authorized entity appointed the FCDO to enter these cases where its appearance, pursuant to its private agenda, is invariably followed by years or decades of delay. Nothing the FCDO says concerning the delays it has caused alters the **fact** of the delays, or the fact that delay is a **pervasive** feature of FCDO litigation, when it suits its agenda.

My Concurring Opinion did not purport to be an exhaustive accounting of the delays the FCDO has achieved in pursuing its global agenda in capital cases. Take, for example, *Commonwealth v. Edmiston,* which appears on the list forwarded by the FCDO in its federal motion in *Dougherty,* and which has since been decided. *Edmiston* was delayed because the FCDO belatedly filed a motion for DNA testing in the context of a serial PCRA petition, **years** after the serial petition was filed and **years** after the DNA testing statute was enacted. Predictably enough, the FCDO filed the motion only as its serial PCRA petition was approaching decision. In reviewing the timeliness of the belated DNA testing motion on appeal, we held that: "our own review of the record and circumstances surrounding [Edmiston's] post-conviction DNA testing request leads to the conclusion that this motion was untimely as a matter of law and was forwarded only to delay further the

execution of the sentence." *Commonwealth v. Edmiston,* 619 Pa. 549, 65 A.3d 339, 357 (2013).

Or, take the case of Craig Murphy, which tellingly was not included in the list appended to the false FCDO motion in *Dougherty.* That is because Murphy's judgment of sentence was affirmed by this Court nineteen years ago, *see Commonwealth v. Murphy,* 540 Pa. 318, 657 A.2d 927 (1995); and we affirmed the denial of relief on Murphy's of-right PCRA petition fifteen years ago. *Commonwealth v. Murphy,* 559 Pa. 71, 739 A.2d 141 (1999). The FCDO has been representing Murphy ever since, and the case has not yet even proceeded to a decision in the federal district court. It appears, from review of the federal PACER docket, that a fully-briefed *habeas* petition has been pending for more than thirteen years; the last activity noted—Murphy's response to the Commonwealth's response to his presentation of new authority—occurred on October 10, 2001. *See Murphy v. Horn,* 2:00–cv–03101.

While the *Murphy* case lay dormant, with the judgment of sentence of death effectively subject to permanent federal injunction without reason, in 2006, the FCDO pursued a serial PCRA petition in state court, which was denied, and this Court affirmed the denial on time-bar grounds in 2009. *Commonwealth v. Murphy,* 601 Pa. 3, 970 A.2d 426 (2009) (*per curiam*). There is no indication on the PACER docket that the FCDO ever: filed a motion requesting a decision on the *habeas* petition; complained to the judge about the inaction; complained to the Third Circuit about the federal delay and inaction; apprised the district court of its foray into state court in 2006 to pursue a serial PCRA petition; or apprised the court of the result of that foray in 2009. Where is the motion of faux-outrage from the FCDO—which is actually appointed as counsel for Murphy for *habeas* purposes-to the federal district court judge or to the Third Circuit complaining of the unconscionable federal court delay in *Murphy?*

Or, consider this case. Over two months before filing its Withdrawal pleading, the FCDO filed a 392–page *habeas* petition in federal district court on appellant's behalf. A

review of the federal PACER docket reveals that, as is typical, the FCDO then moved to stay that petition, noting that appellant was pursuing a PCRA attack on his noncapital homicide conviction arising from Clearfield County, which formed the basis for an aggravating circumstance in his three capital murder cases. Once the state collateral attack upon the Clearfield County conviction proved unsuccessful earlier this year, the FCDO filed motions to reactivate appellant's other two capital *habeas* matters, but not this one. Called upon by the federal district court judge to explain its lapse, FCDO lawyers claimed that they "were under the erroneous assumption that the proceedings in this case had been stayed on both the pending Clearfield County state court proceedings and the absence of a final determination of [appellant's] reargument motion that remains pending before the Pennsylvania Supreme Court. Counsel were wrong." *Spotz v. Wetzel*, No: 3:02–CV–0614 (Petitioner's Response to the Court's July 16, 2014 Order).

These examples further confirm the deliberate falsity of the FCDO's allegations about this Court, which it forwarded in the federal motion in *Dougherty*, in an attempt to secure a state court bypass. The FCDO's current complaint about my Concurring Opinion ignores the context of its scurrilous federal motion in *Dougherty* and thus demonstrates another distressing lack of candor.[23]

My commentary on FCDO tactics is not intended to suggest that capital defendants cannot avail themselves of legitimate procedures. But, if a defendant is interested in avoiding delays, there is nothing to keep him from going forward sooner. For purposes of the FCDO's current complaint that my Concurring Opinion was wrong to comment on its pervasive conduct in causing delay, the FCDO well knows that I spoke in the context of the FCDO's falsehoods in *Dougherty*. My Concurring Opinion remains true: the FCDO "obviously has no fixed position on delay." Rather:

23. The FCDO does not state whether it ever corrected its false averments in the *Dougherty* motion.

When delay advances their global litigation strategy, they do their best to grind state courts to a halt, as with their prolix pleadings and abusive briefing in this case, and their more extreme conduct and/or misconduct in cases like *Banks*, *Abdul–Salaam*, and *Bracey*. When faux outrage about the delays their overall strategy necessarily induces serves their purpose, they forward that claim, accusing Pennsylvania courts of incompetence or laziness, their argument unencumbered by concerns for accuracy, honesty, and candor.

*Commonwealth v. Spotz*, 18 A.3d at 348–49 (2011) (Castille, C.J., concurring, joined by McCaffery, J.). Because the FCDO disingenuously fails to come to terms with the false position it formally staked out in *Dougherty*, this ground of complaint concerning my Concurring Opinion is contemptible.

Similarly disingenuous is the FCDO's current allegation that my Concurring Opinion faulted it for merely seeking to expedite review in certain cases. Motion, at 24. My discussion of those expedition requests was in the context of the overall burden placed upon the Court by the FCDO's federally-financed private litigation agenda. Indeed, the discussion followed immediately after I posed these questions:

Does it comport with principles of federalism for lawyers financed by the federal courts to so affect a state Supreme Court's docket? Does it comport with principles of federalism for the federal courts to finance a group to enter state capital cases at will and pursue an agenda that inundates the PCRA courts and this Court with abusive pleadings and frivolous claims, with the apparent ultimate aim of attempting to **bypass** the state courts?

*Spotz*, 18 A.3d at 336 (Castille, C.J., concurring, joined by McCaffery, J.) (emphasis in original). Regarding motions for expedition, I then noted, "none of the motions mention the length of the [FCDO] briefs in the appeals, or the number of prolix claims, or the complexity of the proceedings and maneuverings below, or the overall and collective burden the [FCDO] has imposed on this Court." *Id.* at 337. This obser-

vation remains true. This FCDO complaint, again ignoring context and characteristically lacking candor, is frivolous.

*B - Quality and Numerosity of Claims -*

I turn next to the FCDO's claim that I misperceive the role and obligations of capital PCRA defense counsel respecting the quality and numerosity of claims that must be pursued on state collateral attack. Notably, the FCDO never engages the specifics of my Concurring Opinion, but instead declares generically that it can "confidently assert" that all of the claims it raised here—and all of the claims it raises in all of its cases—are "arguably meritorious." Motion, at 7. My commentary on the FCDO brief was not vague or generic; it was specific. The FCDO Brief here was exactly 100 pages, a length representing this Court's indulgence since briefs, at that time, were not to exceed an already-generous 70 pages without leave of the Court. I noted in my Concurring Opinion that the FCDO flouted that indulgence by dispensing with required briefing elements, such as a Statement of the Case, thus creating space to burden the Court with more claims. I described with specificity other abuses in the Brief:

> The Brief pretends to raise "only" 20 issues, which would be burdensome enough. But, within those twenty claims are multitudes of additional claims or sub-claims. My conservative count of the total number of distinct "claims" presented in the Defender's Brief, including both derivative and subsidiary allegations, exceeds 70. How does the Defender manage to "litigate" 70 claims in a 100–page brief? It employs a number of additional tricks.
>
> or example, in 100 pages of Brief, the Defender includes no less than 136 single-spaced footnotes, many of extreme length, and then routinely advances distinct substantive arguments in those footnotes. *See, e.g.,* Initial Brief of Appellant, nn. 15, 18, 20–29, 32–33, 37–39, 43–51, 53, 59, 61–70, 72–77, 79–85, 94–95, 103, 107–18, 123–25, 127–34. The Defender also seizes more briefing space by single-spacing, and not indenting, its Statement of Questions Presented, making them virtually unreadable in the process. *See, e.g.,*

*id.* at 2 (containing 40 single-spaced lines of text running margin to margin). Another common Defender abuse, immediately recognizable to those of us charged with attempting to read their Briefs, is to list distinct claims or subclaims by single-spaced bullet point in text, essentially doubling the number of points to be made. To make the abuse worse, these bullet points often simply declare the subclaims without development or legal support; other times, the Defender will append footnotes, which may contain factual support or substantive argument, or may provide no meaningful development or explanation of the relevance of bald citations. *See, e.g., id.* at 29–30 & nn. 27–29; 47–48 & nn. 53–57; 53; 64–65 & nn. 82–83; 66–67 & nn. 86–92; 71–72 & nn. 96–101; 75–76; 83; 95–98 & nn. 125–34. The time-consuming burden is then placed on the Court to attempt to decipher the arguments.

*Spotz,* 18 A.3d at 333–34 (Castille, C.J., concurring, joined by McCaffery, J.).

Beauty may reside in the eye of the beholder, but the FCDO is certainly wrong in stating that the measure of what is legally frivolous is equally subjective and convenient. A claim lacking a basis in law or fact is frivolous. *See, e.g., Commonwealth v. Chmiel,* 612 Pa. 333, 30 A.3d 1111, 1190 (2011) ("A frivolous issue is one lacking in **any** basis in law or fact."). It is frivolous to say that trial counsel is constitutionally obliged to object to every theoretically disputable word out of a trial prosecutor's mouth, for example; meritorious ineffectiveness claims require more than merely identifying a potential objection. Boilerplate or undeveloped claims—such as the numerous skeletal claims in text, in footnote, and in bullet point included in the Brief in this case—are frivolous beyond question. No party can conceivably expect to prevail upon a claim identified only in the abstract, without explanation, development, context, and legal argument. *See McCoy v. Court of Appeals,* 486 U.S. 429, 436, 108 S.Ct. 1895, 100 L.Ed.2d 440 (1988) ("[a] lawyer ... has no duty, indeed no right, to pester a court with frivolous arguments, which is to say arguments that cannot conceivably persuade the

court. . . .") (quotation omitted); *accord Smith v. Pennsylvania Bd. of Probation and Parole*, 524 Pa. 500, 574 A.2d 558, 563 (1990). The fact that the case is a capital one, and that the FCDO seeks to impede the death penalty to indulge its private political viewpoint, does not allow officers of the Court to abuse or pester the Court with frivolous claims. *Chmiel*, 30 A.3d at 1191.

Moreover, the FCDO briefing abuse in this case is not atypical. Take, as a second example, *Commonwealth v. Roney*, 587 CAP, which was included in the list appended to the FCDO's mendacious federal motion in *Dougherty*. The *Roney* appeal has since been decided. In my Concurring Opinion in *Roney*, I described the abuses in the FCDO's initial brief, as well as the delay its litigation agenda caused in that case, as follows:

This appeal was pending when *Spotz* was decided, already having been briefed and submitted. Soon after *Spotz* was decided, however, this Court acted upon the fact that the FCDO brief in this case was abusive in the same fashion as the *Spotz* brief had been. Thus, by *per curiam* order, the Court directed that a conforming brief be filed:

AND NOW, this 9th day of June, 2011, upon review of the briefs in this submitted capital PCRA appeal, the Court has determined that counsel for Appellant [the FCDO] have filed a brief that does not conform with the Pennsylvania Rules of Appellate Procedure.

The non-conforming brief does not contain a Statement of the Case, the inclusion of which is described and is mandatory, pursuant to Pa.R.A.P. 2111(a)(5) and Pa. R.A.P. 2117. In addition, while purporting to raise thirteen issues, in actuality, by conservative count, the brief raises over seventy issues, many of which are undeveloped. Further, counsel have burdened the Court with seventy-eight single-spaced footnotes, many of which purport to raise substantive arguments. Accordingly, the indulgence of the Prothonotary's May 4, 2010 administrative order granting leave to file a brief in excess of page

limitation set forth in Pa.R.A.P. 2135(a)(1) having been abused, that order is hereby VACATED.

The Prothonotary is to return the Initial Brief for Appellant, along with the Appendix of Initial Brief of Appellant, to counsel for Appellant to file a brief conforming to the Rules of Appellate Procedure within thirty days of this order.... Page limitations will be strictly enforced, and substantive arguments and sub-arguments are not to be set forth in footnotes or other compressed texts such as block quotations or single-spaced bullet points. Such practices facilitate violation of the restrictions on the length of briefs, and arguments set forth in such fashion will not be considered.

Order, 6/9/11.

The Court's decision today, by a Majority Opinion in excess of seventy pages, is in response to the conforming briefs we directed in the wake of *Spotz*.

It is also notable, given the FCDO's claims respecting delay in capital cases, that before filing its initial brief here, the FCDO requested seven extensions of time, including three requests forwarded after a directive that no further extensions would be granted. Those seven requests alone caused over seven months of delay. In all but the last of its extension requests, the FCDO cited to its workload, including its workload in state PCRA matters. Since the FCDO's "voluntary" activities involving first-petition capital PCRA matters are not by way of federal court appointment, every delay occasioned by the organization due to manpower or workload is chargeable to the FCDO's extensive private agenda in state court which, it is apparent, includes strategic delay. In the future, unless the FCDO is acting pursuant to explicit federal court appointment and authority to pursue an initial PCRA petition, I would not accept FCDO workload as a relevant or legitimate basis for delay in the PCRA courts, or on appeal in this Court.

*Commonwealth v. Roney*, 622 Pa. 1, 79 A.3d 595, 647 (2013) (Castille, C.J., concurring).

The FCDO claims that the defendant's federal constitutional claims must be exhausted in state court in order to pursue the same claims on subsequent federal *habeas* review, if any such review should occur. Ignoring that federal *habeas* review is not the primary or exclusive focus of state court litigation, that collateral point is true enough. But, the federal exhaustion requirement does not mean that all possible claims (federal and state) must, may or should be presented in an appeal to the Commonwealth's highest Court; and it certainly does not mean that all conceivable claims must be listed, even if only in vague, conclusory, skeletal or unintelligible fashion. To the contrary, the federal *habeas* exhaustion doctrine requires a **fair presentation** of federal claims to state courts. "Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to resolve the claim on the merits." *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 10, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Deliberately abusing a state's highest court with a list of bald assertions—as the FCDO deliberately did here—does not fairly articulate federal claims. A boilerplate declaration with a footnote containing unexplained citations does not fairly present and properly exhaust a federal claim. Rather, the tactic abuses and pesters the state court. And, nothing in the federal exhaustion requirement authorizes lawyers to ignore or subvert state court briefing rules and specific court orders governing the content, form, and length of briefs.

One additional fact—conveniently not addressed by the FCDO—makes clear just how deliberately abusive the FCDO Brief was in this case. The FCDO initially requested leave to file a brief of 137 pages in length—twice the authorized maximum. The request was largely boilerplate, apparently borrowed from a template where the request was to accept a brief of 100 pages. Thus, where the number "100" appeared in typeface, FCDO counsel crossed it out and scribbled in, "137." This effort led to the following contradictory assertion concerning what this Court "routinely accepts:"

Because of these considerations, Appellee's [sic] brief necessitated additional pages. The brief, however, has been edited to under 100 ["100" crossed-out and "137" handwritten in] pages, pursuant to this Court's usual policy in capital cases of accepting briefs of 100 pages or less. . . . This Court has routinely granted such requests in capital cases, where the brief did not exceed 100 ["100" crossed-out and "137" handwritten in] pages.

Motion, 5/29/09, ¶¶ 10, 12. This Court has never routinely allowed "137 page" briefs in capital cases, and the Court specifically denied the cut-and-paste request here, leaving the FCDO with a still-indulgent authorization to file a brief of 100 pages. It is apparent that the Brief ultimately filed represented the FCDO's deliberate flouting of a specific order rejecting a 137–page brief. Rather than comply with a Court order, the FCDO abused the Court, dispensing with a statement of the case, and jamming non-developed issues into bullet points and footnotes. This FCDO Brief is simply indefensible, which no doubt explains why the FCDO's instant objection is vague, generic, and ultimately contemptuous.[24]

The FCDO next attempts to justify the number and "quality" of the claims it "briefed" by citing standards it says are established by the ABA. The FCDO then argues that my "misperception" concerning the proper role of capital PCRA defense counsel is proven by consultation of the ABA's 2003 "Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases." *See* 31 Hofstra L.Rev. 913 (2003). The FCDO says that it takes its "approach to capital representation" from the 2003 ABA Guidelines. The FCDO argues that it would be easy to comply with briefing rules if the FCDO "raised only two or three claims in each brief," but "it would be ethically improper for the FCDO to 'winnow' claims in that fashion" in a capital PCRA appeal. Rather, the

24. At one point, the FCDO asserts that my "complaint" appears to be more about the sheer number of claims rather "than the manner in which they are briefed." Motion, 29. This is deliberate nonsense: my Concurring Opinion plainly expressed concern with the manner of presenting and developing the claims, as well as the abusive number of claims, and the blatant violations of the briefing rules.

FCDO states, it believes it has "an ethical duty to raise and exhaust claims on behalf of our clients." The FCDO adds that its decision to raise innumerable claims follows the ABA's preference, which urges capital collateral counsel to litigate all "arguably meritorious" claims and to beware that winnowing issues "can have fatal consequences." Motion, 6, 29, quoting ABA Guidelines. This argument does not begin to excuse the abuses and excesses in the FCDO Brief here or in its capital litigation agenda generally. Indeed, the fact that the FCDO admits that its agenda in Pennsylvania cases follows this approach as a matter of routine is reason enough to remove it from all Pennsylvania capital cases.

First, the FCDO's abuses in briefing here did not arise from the difficulty of raising four or five issues, rather than two or three. The FCDO raised over seventy issues or sub-issues. Second, the implied notion that the FCDO's asserted "ethical duty" to raise all claims is an excuse to flout briefing rules, and specific briefing orders from the Court, obviously is frivolous. FCDO lawyers—like all lawyers—are obligated to obey court rules and orders, and to conform their strategies and agendas to that ethical reality. If the FCDO thinks that a state court briefing rule or court ruling violates the federal Constitution, the FCDO should be frank and raise and articulate that claim. But, the fact that a reasonable rule or ruling impedes the FCDO's agenda does not grant the organization license to contemptuously flout both the restriction and the Court.

Finally, general guidelines and preferences expressed by the ABA, or by any other private organization for that matter (including the FCDO), obviously cannot justify any lawyer in ignoring court rules and rulings and then filing an abusive brief, littered with frivolous claims. The FCDO appears to suggest that the ABA would approve the abusive brief it filed here; I certainly hope that would not be the case. But, the ABA's approval, or its disapproval of the FCDO's conduct, is irrelevant. The conduct of counsel in capital PCRA matters is not governed by the opinions and suggestions of the ABA generally, or of the subcommittee that offered its idiosyncratic

view on capital litigation—or by any other private group. No relevant governmental entity has delegated authority to the ABA or to any other group respecting the appropriate manner of litigating criminal cases generally, or capital PCRA matters explicitly. Indeed, this is the ABA's own understanding. *See, e.g.,* Brief of the ABA as *Amicus Curiae* in *Martinez v. Ryan,* 566 U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), at *3 ("The ABA Standards do not provide *per se* rules or a checklist for judicial evaluation of attorney performance, nor do they purport to establish the constitutional baseline for effective assistance of counsel."). The practice of law in Pennsylvania is subject to the standards of the Supreme Court of Pennsylvania. The FCDO's lawyers should take heed that their oath of office obliges them to "support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth;" to "discharge the duties of [their] office with fidelity, **as well to the court as to the client;**" and to "use no falsehood, nor delay the cause of any person for lucre or for malice." 42 Pa.C.S. § 2522 (emphasis supplied).

Justice Samuel A. Alito, Jr., addressed the limited, tangential relevance of the ABA's 2003 Guidelines as follows:

I join the Court's *per curiam* opinion but emphasize my understanding that the opinion in no way suggests that the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) (2003 Guidelines or ABA Guidelines) have special relevance in determining whether an attorney's performance meets the standard required by the Sixth Amendment. The ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership. The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole. It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines

should be given a privileged position in making that determination.

*Bobby v. Van Hook,* 558 U.S. at 13–14, 130 S.Ct. 13 (Alito, J., concurring).

I expressed a similar view the year before Van Hook:

I realize that *Strickland [v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ] and later cases refer to American Bar Association-promulgated standards as guides for evaluating the reasonableness of attorney performance respecting mitigation investigations.... However, I would be wary of going too far with such observations, absent evaluation and adoption of such commands by those in authority in Pennsylvania, or an express command along those lines from the High Court. Moreover, the Court has recognized that applicability of the standards may be subject to dispute.... Of course, the ABA does much good work to advance the cause of justice. In recent years, however, the ABA has chosen to be a very active voice, almost invariably on the defense side, in criminal and particularly capital matters. Its activism in this regard has been pronounced enough to lead many prosecutors away from the organization. Notwithstanding the good work and dedication of the ABA generally, and its prestige, in this instance at least, I would keep in mind that its suggestions are those of a private organization, not answerable to the people's voice or purse, offering one view, which does not necessarily account for the views of all with front-line experience in these matters.

*Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1155 n. 10 (2008) (Castille, C.J., joined by McCaffery, J., concurring). *See also Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 132 (2008) ("Appellant notes the [ABA] guidelines recommend two qualified trial attorneys should represent the defendant in death penalty cases. This Court has never endorsed or adopted the ABA guidelines in full. We do not do so now. Appointment of additional counsel is not a right; it is within the trial court's discretion.").

This view is not an outlier. The unanimous U.S. Supreme Court in *Van Hook* addressed at some length the limited relevance of the ABA Guidelines in identifying practice norms, and thus the inability of the ABA's opinions to serve as a basis to assess attorney performance. In the process, the Court noted the stark difference in the "detailed prescriptions" found in the ABA's totally reworked 2003 approach, which covered some 131 pages (perhaps reflecting both the ABA's emerging oppositional stance on capital punishment as well as the oppositional orientation of the advisory committee that drafted the new guidelines, *see* 31 Hofstra L. Rev. at 914 (listing affiliations of members of advisory Committee)), as compared to its simpler, more neutral, previous Guidelines. The High Court also criticized the 2003 Guidelines because of their lack of flexibility and warned courts against treating the ABA's revamped private views as "inexorable commands":

> The Sixth Amendment entitles criminal defendants to the "'effective assistance of counsel'"—that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). That standard is necessarily a general one. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U.S. at 688–689, 104 S.Ct. 2052. Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place. *Id.*, at 688, 104 S.Ct. 2052.

The Sixth Circuit ignored this limiting principle, relying on ABA guidelines announced 18 years after Van Hook went to trial. *See* 560 F.3d, at 526–528 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, comment, pp. 81–83 (rev.

ed.2003)). The ABA standards in effect in 1985 described defense counsel's duty to investigate both the merits and mitigating circumstances in general terms: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." 1 ABA Standards for Criminal Justice 4–4.1, p. 4–53 (2d ed. 1980). The accompanying two-page commentary noted that defense counsel have "a substantial and important role to perform in raising mitigating factors," and that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.,* at 4–55.

Quite different are the ABA's 131–page "Guidelines" for capital defense counsel, published in 2003, on which the Sixth Circuit relied. Those directives expanded what had been (in the 1980 Standards) a broad outline of defense counsel's duties in all criminal cases into detailed prescriptions for legal representation of capital defendants. They discuss the duty to investigate mitigating evidence in exhaustive detail, specifying what attorneys should look for, where to look, and when to begin. See ABA Guidelines 10.7, comment, at 80–85. They include, for example, the requirement that counsel's investigation cover every period of the defendant's life from "the moment of conception," *id.,* at 81, and that counsel contact "virtually everyone ... who knew [the defendant] and his family" and obtain records "concerning not only the client, but also his parents, grandparents, siblings, and children," *id.,* at 83. Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was error.

To make matters worse, the Court of Appeals (following Circuit precedent) treated the ABA's 2003 Guidelines not merely as evidence of what reasonably diligent attorneys

would do, but as inexorable commands with which all capital defense counsel " 'must fully comply.' " 560 F.3d at 526.... *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. 466 U.S. at 688, 104 S.Ct. 2052. We have since regarded them as such.[FN 1] *See Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). What we have said of state requirements is *a fortiori* true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores–Ortega*, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).

[FN 1.] The narrow grounds for our opinion should not be regarded as accepting the legitimacy of a less categorical use of the Guidelines to evaluate post–2003 representation. For that to be proper, the Guidelines must reflect "[p]revailing norms of practice," *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, and "standard practice," *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and must not be so detailed that they would "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions," *Strickland, supra*, at 689, 104 S.Ct. 2052. We express no views on whether the 2003 Guidelines meet these criteria.

*Van Hook*, 558 U.S. at 7–9, 130 S.Ct. 13. *Accord Cullen v. Pinholster*, 563 U.S. 170, 196, 131 S.Ct. 1388, 1407, 179 L.Ed.2d 557 (2011) (identifying proper *Strickland* measure as "the standard of professional competence in capital cases that prevailed in Los Angeles in 1984" (the time and place of trial); noting also relevance of whether strategy employed was one in use by defense bar at relevant time).

In short, the Constitutions (state and federal), the Rules of Professional Conduct established by this Court, and norms and standards of practice, which respect the wide latitude afforded counsel, are the proper measure of counsel's "ethical duties," not the opinions or preferences of private groups, answerable to a different agenda. Advocacy that is both effective and ethical in capital PCRA appeals is little different

than advocacy in any other appeal: counsel must act ethically, follow the rules and obey court orders, and should focus on strong claims. Counsel should never litter a PCRA petition or brief, and thereby "pester" any court, with limitless weaker claims and sub-claims—much less undeveloped or fragmentary claims. Contrary to the erroneous private views of the FCDO, "[t]he law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 556 U.S. 111, 127, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009), citing *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *accord Jones*, 463 U.S. at 751–52, 103 S.Ct. 3308 ("experienced advocates since time beyond memory emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues"); *id.* at 754, 103 S.Ct. 3308 ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every colorable claim suggested by a client would disserve the very goal of vigorous and effective advocacy."). Thus, "ethical and diligent counsel may winnow the available claims so as to maximize the likelihood of obtaining relief." *In re Reno*, 146 Cal.Rptr.3d 297, 283 P.3d at 1212 (citing *Jones*). And, there are simply no circumstances that allow counsel to deliberately flout briefing rules and rulings merely to add more claims to abuse an appellate court, exhaust its time and resources, foster delay, and manufacture a platform to file the sort of scurrilous claims the FCDO forwarded in, for example, *Dougherty* and *Abdul–Salaam*. Yet, that is precisely what the FCDO has done in this case, not only with its inexcusably abusive brief, but with this frivolous and disingenuous Motion, which refuses to take responsibility for multiple, obvious ethical derelictions.

The California Supreme Court in *Reno* well expressed the proper balance. After summarizing the *Van Hook* Court's criticism of reliance upon the private opinions powering the 2003 ABA Guidelines, the *Reno* court noted:

> We agree with the high court's characterization of the ABA Guidelines. California, consistent with federal law, requires that counsel—including in capital cases—make ob-

jectively reasonable choices according to prevailing professional norms. . . . To the extent petitioner relies on the ABA Guidelines' directives that "[p]ost-conviction counsel should seek to litigate *all issues, whether or not previously presented*" (ABA Guidelines, guideline 10.15.1(C), italics added), and that counsel is required to preserve "*'any and all conceivable errors'*" (ABA Guidelines, p. 87, italics added), to justify his position that postconviction counsel in capital cases is ethically bound to raise defaulted claims in an exhaustion petition, we reject the point because the ABA Guidelines require much more of counsel than is required by state and federal law governing ineffective assistance of counsel.

146 Cal.Rptr.3d 297, 283 P.3d at 1213 (citations omitted). *See id.* 146 Cal.Rptr.3d 297, 283 P.3d at 1214 ("The ABA Guidelines thus recommend a higher level of rigor than does this court or the United States Constitution.").

In short, the FCDO's generic and unapologetic defense of its abusive briefing approach in capital PCRA appeals where it has injected itself as counsel in pursuit of its private agenda, premised upon the private preferences reflected in the 2003 ABA Guidelines, provides zero justification for the Brief it filed and the briefing order it contemptuously flouted in this case. Thus, the FCDO's current complaint provides no basis for the withdrawal of my Concurring Opinion on grounds that I, rather than the FCDO, "misperceive" the "proper" role of capital PCRA counsel. The actual governing principle for ethical capital PCRA counsel is to make reasonable choices in determining which issues to pursue, so as not to pester the court and cause delay just for the sake of delay; to candidly acknowledge governing law; and to file professional pleadings that conform to court rules, court rulings, and the actual ethical standards governing our profession. Legitimate representation, however zealous, does not embrace a scorched earth policy of listing all possible claims, developing them erratically or not at all, flouting court rulings, seeking to manipulate procedural defaults, placing the burden upon the Court to drop all other matters in an attempt to decipher the Brief, and

then further wasting the Court's time and resources when ethical lapses are noted. The governing standard does not encompass, require, or approve inundation of the PCRA courts, or of this Court on appeal, with undeveloped claims and sub-claims, or other abjectly frivolous claims. No good lawyer would do this: unless a private agenda was at work.

### C. - FCDO Agenda -

I turn next to the FCDO's complaint that my Concurring Opinion comments on the burden its global litigation agenda in capital cases has placed upon Pennsylvania courts. The FCDO declares that it has no such agenda. However, the legitimacy of that position is tied to the FCDO's proffered justification for its manner of litigation, including its disingenuous stances that frivolous claims are not objectively measurable, that it is ethically required to raise all non-frivolous claims, and that its ethical duties justify it in flouting briefing rules and Court orders. I have already addressed these mistaken notions. Moreover, it bears repeating that the FCDO, despite burdening the Court with this Motion, never attempts to defend the actual Brief it filed in this case except through generic, and mistaken, assertions. The FCDO's manner of litigation unquestionably has caused substantial delay, and has required an unwarranted commitment of the Court's resources to wade through multiple, abusive pleadings.

It also warrants emphasis that the FCDO does not just abuse this Court with its scorched-earth private litigation agenda in capital cases; it gratuitously overtaxes the trial courts as well, as I explained in my Concurring Opinion detailing the excessive, abusive FCDO effort here. At the outset of this Opinion, I quoted the trial court's opinion in *Commonwealth v. Eichinger*, 657 CAP, detailing a similar effort. Judge Carpenter's opinion noted, *inter alia*, that:

> This case has caused me to reasonably question where the line exists between a zealous defense and an agenda-driven litigation strategy, such as the budget-breaking resource-breaking strategy on display in this case. Here, the cost to the people and to the trial Court was very high. This Court

had to devote twenty two full and partial days to hearings. To carry out the daily business of this Court visiting Senior Judges were brought in. The District Attorney's capital litigation budget had to have been impacted. With seemingly unlimited access to funding, the Federal Defender came with two or three attorneys, and usually two assistants. They flew in witnesses from around the Country. Additionally, they raised overlapping issues, issues that were previously litigated, and issues that were contrary to Pennsylvania Supreme Court holdings or otherwise lacked merit.

Opinion, Carpenter, J., July 25, 2012, at 1–2.

Furthermore, laying aside the diversion of federal funds to support the FCDO's "private" activities in Pennsylvania capital cases, the FCDO's own description of its basis for appearing in Pennsylvania cases without court appointment or other authorization corroborates that it acts in pursuit of a private agenda. The FCDO has not been retained by the scores of indigent capital defendants it has been representing with federal resources. Instead, the FCDO embarked upon a deliberate course to secure for itself the statewide role of primary counsel for capital PCRA petitioners through some form of private, "volunteer" arrangements with individual defendants. An agenda involving such arrangements invites abuse, and this case demonstrates how that can entail abusive briefing.

No court appointed the FCDO to assist appellant in filing his PCRA petition. Appellant either asked the FCDO to assist him or the FCDO solicited appellant, offering its "free" services and ability to deploy vast federal resources in state court, and he agreed. Lawyers owe competing duties: to their clients primarily, but they are also constrained by core ethical duties to the court. This reality can create tensions in any criminal case, especially with difficult clients, and the stakes are higher in capital cases. Nevertheless, no lawyer is authorized to abuse a court, by raising frivolous claims, or flouting a court briefing order, to appease a client. In some

cases, the lawyer must stand up to the client, or the client must pursue his own cause.

A client who disagrees with his lawyer can fire the lawyer, if he is retained; or seek new counsel, if the lawyer is appointed; or seek appointed counsel, if he is indigent and the lawyer is a "volunteer" "private" lawyer; or he can represent himself, if he cannot otherwise be satisfied. A criminal defendant, like citizens generally, has a right to self-representation, even if his lawyer thinks self-representation is a bad idea; and he certainly has a right to refuse the unwanted assistance of non-retained, non-appointed, "volunteer" "private" federal lawyers pursuing their own agenda. But, none of these scenarios ever authorize an officer of the court—retained, appointed, or volunteer—to abuse and burden the court, whether to indulge the client or for any other reason. General questions of ethics aside, the only lawyer who would have difficulty navigating these shoals is one who decides that remaining in the case at all costs is the prime directive. And, that is where the FCDO's special political agenda comes in: not only is the FCDO obviously willing to abuse the court to keep its client happy—which is even in question here (as explained *infra* )— but the FCDO has demonstrated in multiple cases the lengths to which it will go to remain in a case against its client's wishes, as I noted in my Concurring Opinion. *Spotz,* 18 A.3d at 339 (Castille, C.J., concurring, joined by McCaffery, J.) (discussing, *inter alia, Commonwealth v. Ali,* 608 Pa. 71, 10 A.3d 282, 290 (2010); *Commonwealth v. Saranchak,* 570 Pa. 521, 810 A.2d 1197, 1198 (2002); and *Commonwealth v. Sam,* 597 Pa. 523, 952 A.2d 565 (2008)).[25]

25. A more recent report of the FCDO's involvement in the unauthorized representation of a Pennsylvania capital defendant involves *Ballard v. Pennsylvania,* —— U.S. ——, 134 S.Ct. 2842, 189 L.Ed.2d 824 (2014) (*per curiam* order denying *certiorari* from this Court's affirmance of judgment of sentence of death). In addition to denying *certiorari,* the U.S. Supreme Court directed the lawyer who filed the petition in *Ballard,* Marc Bookman of the Atlantic Center for Capital Representation, to respond to a letter from Ballard himself. That letter claimed that Attorney Bookman's *certiorari* filing on Ballard's behalf was unauthorized, that he did not wish to appeal, and that the filing was the product of the FCDO's attempt "to secure themselves as 'attorney's of record' so as to circumvent having to obtain my authorization." I have

Lawyers operating pursuant to a pervasive private agenda in capital cases can cause other mischief, as well. Pennsylvania has a policy against "hybrid" representation, that is, we typically do not consider the merits of *pro se* briefs or motions filed by counseled defendants. See *Commonwealth v. Reid*, 537 Pa. 167, 642 A.2d 453, 462 (1994); *Commonwealth v. Ellis*, 534 Pa. 176, 626 A.2d 1137, 1140 (1993). This system assumes honest and responsible lawyers. When a court receives *pro se* communications from a represented client, it ordinarily waits for the lawyer to respond or act, albeit courts obviously retain the discretion to direct counsel to respond. Lawyers with agendas in tension with the wishes of their clients, however, may game this arrangement to act contrary to the wishes of their clients. So, for example, in this case, appellant sent a

noted above, in the discussion of the FCDO's *"amicus"* work on behalf of Mexico in *Commonwealth v. Padilla*, Attorney Bookman's close relationship with the FCDO.

Attorney Bookman responded by letter dated July 8, 2014, corroborating the FCDO role and admitting he never met with Ballard. Attorney Bookman stated that after Ballard's direct appeal was decided he was approached by an attorney with the FCDO, whom Bookman did not name, and who claimed Ballard had asked the FCDO "to find him an attorney to file a Petition for a Writ of Certiorari" and Bookman "agreed to do so." The FCDO had never been appointed to represent Ballard. Attorney Bookman did not claim that he ever spoke with Ballard himself, or with Ballard's court-appointed counsel. The Northampton County District Attorney's Office responded by attaching a letter from Ballard's court-appointed counsel, which related that: counsel received a telephone call from an FCDO lawyer, offering that he knew someone who might be willing to file a *certiorari* petition for Ballard, and asking to see materials relating to the case; counsel wrote to Ballard, who responded that he wanted no further appeals and that counsel was not to provide materials to any third party; counsel advised the FCDO lawyer of Ballard's directions and wishes; the FCDO lawyer nevertheless said his office "will take it from here and speak directly with [Ballard] about the appeal;" and, after the *certiorari* petition was filed by Attorney Bookman, Ballard called counsel, asked who Bookman was, and advised that the FCDO had attempted to speak with him, but he told the FCDO he did not want to appeal. Ballard also then filed his *pro se* letter with the U.S. Supreme Court, complaining about the FCDO and Attorney Bookman pursuing the unauthorized *certiorari* petition.

By order dated August 11, 2014, the Supreme Court referred the letters from Ballard, Attorney Bookman and the District Attorney to the Disciplinary Board of the Supreme Court of Pennsylvania "for any investigation or action it finds appropriate."

letter to the Supreme Court Prothonotary, dated January 4, 2012 (stamped received on January 9, 2012), relating the following (bold emphasis added):

Dear Prothonotary:

I am a death row inmate. I have 2 capital appeals pending before this court [576 CAP and 610 CAP]. I want to waive those appeals. I do not know my case numbers **and my lawyers will not file this waiver for me.** Please, I beg of you, please file this letter into the record and present it to the judge so that I can be executed.

Thank you for your kindness and mercy.

Sincerely,

/s/

Mark Spotz

The same day, appellant directed a separate letter, addressed to myself, with a "Re" line entitled "WAIVER OF CAPITAL CASE APPEALS," stating that he "should have been executed a long time ago," no longer wished to pursue his appeal, and saying "allow no one to interfere." The letter is courtesy copied to three FCDO lawyers.

The FCDO has filed no motions in light of these *pro se* communications, and according to appellant at least, refused to do so, against his wishes.[26] If the appeals were not already concluded, remand would be required to ensure that appellant's expressed cause is pursued, and not a contrary private agenda of the FCDO.

There is a documented, earlier tension between the FCDO and appellant. On November 18, 2008, appellant filed a *pro se* petition to remove the FCDO and to allow him to proceed *pro se* on PCRA appeal. Appellant alleged that there were claims he had made counsel aware of, but that counsel had not raised below. Appellant said that if the FCDO "is not going to fully litigate all meritorious issues on appeal, which they have failed

---

**26.** The FCDO's Withdrawal pleading did not encompass the pending reargument petition; and, as noted, the FCDO apparently has used the pendency of the reargument petition to continue delaying appellant's federal *habeas* proceedings.

to do," then appellant would prefer to represent himself, as was his right. Five months later, appellant withdrew the Motion, stating that he had since met with counsel in person and spoken to counsel over the telephone. Appellant stated that, "I do not want to proceed *pro se*. I want to be represented by current counsel, **but I want counsel to raise all available issues.**" Motion, 3/10/09, ¶ 4 (emphasis supplied).

This circumstance may explain why the FCDO would file something so blatantly contemptuous as the Brief in this case, after the Court had specifically denied the request to file the 137-page brief it initially prepared. The FCDO apparently determined that it had to make its "client" happy, even if it meant abusing the Court, so that the FCDO could remain in the case; the FCDO's "stay in the case at all costs" agenda trumped its core ethical obligations to the Court. This circumstance does not happen absent the dynamic of the federally-financed FCDO "volunteering" its "private" services to clients who are not obliged to accept the offer. All lawyers without such an agenda properly resist demands from a client that require unethical conduct. But, a lawyer or organization with a political agenda to remain in a case—indeed, in all capital cases at all costs—but subject to being "fired" by the client, is tempted by a different calculus. It appears that the FCDO indulged that temptation here, simply ignoring its lawyers' duties as officers of the Court.

The additional specifics of the FCDO's agenda are shrouded in the mystery of its hybrid status, the precise extent of its involvement in Pennsylvania capital cases, the true extent of its past and present diversion of federal funds, its relationship to the AO and the federal courts when it engages in so-called "private" state court litigation, and the actual manner in which it has managed to monopolize Pennsylvania capital cases without answering to any legitimate authority. The FCDO's strategic refusal to be candid—to, in the words of our order in *Mitchell*, take the modest step of "demonstrat[ing] that its actions here were all privately financed, and convincingly attest that this will remain the case going forward"—combined

with its self-assumption of the central role of capital defense in Pennsylvania, requires a response from Pennsylvania, and an institutional response from this Court, which I address in Part VII below. For present purposes of evaluating the claim that I am required to withdraw my Concurring Opinion, the FCDO has alleged nothing to diminish the demonstrated, multiple concerns with the obstructionist intention and effects of its private litigation agenda in Pennsylvania courts, as revealed by its conduct in this case, and in many other cases.

For all of the above reasons, the FCDO has identified no reason why I should withdraw my Concurring Opinion. The request is denied.

### VII. Remedial Measures—Short Term

In my Concurring Opinion, I made suggestions respecting appellate briefing in capital PCRA matters, "[t]o curb the rampant abuses in this case and other cases":

(1) Direct the Supreme Court Prothonotary to immediately reinstate a briefing limit of 70 pages in capital PCRA appeals, with no exceptions absent: (a) a showing of extraordinary circumstances; and (b) the explicit concurrence of the Commonwealth.

(2) Direct the Supreme Court Prothonotary to amend briefing notices to advise parties that: (a) substantive arguments and sub-arguments are not to be set forth in footnotes or other compressed texts, such as block quotes or single-spaced bullet points, since such practices facilitate violation of the restrictions on the length of briefs; and (b) arguments set forth in such fashion will not be considered. I would also refer the matter to the Appellate Procedural Rules Committee to recommend changes to our Rules to curb these abuses, including: (a) limitations on the number of words in a brief, such as are found in the Federal Rules, and (b) required certification from counsel that the brief is compliant.

18 A.3d at 349 (Castille, C.J., concurring, joined by McCaffery and Orie Melvin, JJ., on this point). As noted, with the exception of its eventual admission to diverting federal funds

to support its state court activities, the FCDO has failed to take responsibility for its abusive litigation activities in Pennsylvania courts, including its disingenuous and infantile claim that there was nothing inappropriate in the way it briefed this appeal and litigated this case. I have explained why the posture so assumed has merely compounded the initial abuse, thus wasting more of the Court's time and resources.

Even indulging the fiction that the FCDO believes what it has said, the Court has already implemented measures along the lines that I suggested, beginning immediately after the decision in this case. For example, the Court's briefing notice in capital PCRA appeals was amended to provide that page limitations would be strictly enforced, that "substantive arguments and sub-arguments are not to be set forth in footnotes or other compressed texts, such as block quotations or single-spaced bullet points," and that points set forth in such a manner would not be considered. This amendment was a direct response to FCDO briefing abuses.

Furthermore, the Appellate Court Procedural Rules Committee responded to the concerns by proposing revisions to the Appellate Rules to rein in the kind of abuses routinely found in FCDO briefs. These revisions were approved by the Court in an order entered on March 27, 2013. Tracking aspects of the federal rules of appellate procedure, the revisions set forth restrictions on the font size used in briefs, *see* Pa.R.A.P. 124, and change the method by which to measure the length of briefs. *See* Pa.R.A.P. 2135. A principal brief, for example, is limited to 14,000 words, unless the brief does not exceed thirty pages. The revised rules also require that counsel file a certificate of compliance if, for example, a principal brief exceeds thirty pages and is measured by use of the word count alternative. *Id.*

The significance of what these changes they say about FCDO abuses should not be overlooked. The Court has always had very flexible briefing rules. The Court had no previous occasion to adopt such explicit rules of limitation, because there was no need to: the professionalism of Pennsylvania lawyers resulted in responsible attorneys generally not

flouting the flexible rules. And then, the federally-financed FCDO came along, in pursuit of its private agenda, and contemptuous of practice rules.

Reforms to rein in abuses at the appellate level only address the back-end of the problem. There is also the question of whether similar reforms should be made to the Rules of Criminal Procedure governing PCRA practice, to ensure that the trial courts no longer are overwhelmed with prolix and abusive pleadings and amendments. The Court's Criminal Procedural Rules Committee has recently published for public comment proposed revisions to Rules 905–909 which, if adopted, should help to rein in abuses. *See* 44 Pa. Bull. 27 (July 5, 2014).

### VIII. Remedial Measures—Long Term

The revelations in this case and in other pending capital PCRA matters where the FCDO has involved itself, making clear that the obstructionist agenda of the FCDO affects the vast majority all Pennsylvania capital PCRA cases, also make clear that foundational measures beyond rewriting briefing and pleading rules are necessary. Pennsylvania simply cannot allow the FCDO to continue in its self-appointed but unauthorized, role as default defense counsel in capital PCRA matters, employing scorched-earth tactics, designed to grind capital cases to a halt. The FCDO should redirect its death penalty abolitionist energy to the political process, where it belongs.

Pennsylvania has an obligation in capital PCRA matters not to subvert the current law, which allows for capital punishment, but rather to provide indigent defendants with trained, competent, ethical, and appropriately compensated counsel, with access to necessary support resources. It is not for some private organization, with a private agenda, and answering to no Pennsylvania authority, to assume for itself the central statewide role of providing defense services. This would be so even if the FCDO were not pursuing an obstructionist agenda, supported with a diversion of federal taxpayer money.

The picture that has emerged is that the well-heeled FCDO has managed to insinuate itself into Pennsylvania cases to

such an extent that it now assumes control over an over-whelming percentage of capital PCRA cases. Given budget-ary constraints at the state and county level within Pennsylvania, and the FCDO's bloated federal budget, it is not difficult to see how the FCDO managed to install itself on a case-by-case, county-by-county basis. As I noted in my Concurring Opinion: "The provision of federally-financed lawyers for state capital PCRA petitioners appears benign on its face and welcome; it spares Pennsylvania taxpayers the direct expense of state-appointed counsel." 18 A.3d at 335. But, I went on to explain:

> [T]hat veneer ignores the reality of the time lost and the expenses generated in the face of the resources and litigation agenda of the [FCDO]. Capital cases, like criminal cases generally, are highly individualized. Each case is invariably about one defendant and one primary capital crime; and the defense lawyer has a duty of zealous advocacy in advancing his client's cause, within the ethical limits that govern all Pennsylvania lawyers, whether they are paid by the federal government or not. But, the [FCDO] has the resources and the luxury to pursue a more global agenda, and its conduct to date strongly suggests that, if it once engaged in mere legitimate zealous defense of particular clients, it has progressed to the zealous pursuit of what is difficult to view as anything but a political cause: to impede and sabotage the death penalty in Pennsylvania.

*Id.*

The reality is that the FCDO has deliberately overburdened the state courts with its resources and tactics, and its tentacles can be found in other stages of litigation as well, including *amicus* work on behalf of foreign governments and their citizens who commit murders in the United States. No Pennsylvania authority has approved this arrangement, no Pennsylvania authority oversees the arrangement, and the FCDO operates in a shroud of secrecy. Neither Pennsylvania generally, nor this Court specifically, is obliged to sit back and allow this private group, pursuing a private agenda, with federal taxpayer funds, employing obstructionist tactics, to assume

this statewide function. Whatever relationship the FCDO has with the federal AO, when its lawyers appear in state court, it is only by this Court's leave, as members of the Pennsylvania bar.

A further concern—one which is a unique function of the FCDO global agenda and its federal funding, expertise and orientation—must be noted. As detailed in my Concurring Opinion, the FCDO takes tactical stances in cases which are designed, not just to seek collateral relief in state court on substantive state and federal claims while also fairly exhausting federal claims, but to lay the groundwork for federal *habeas* positions designed to undermine Pennsylvania law, and sovereignty, across the board:

A competent appellate lawyer without a global agenda, intent on having his client's issues actually heard on appeal, would **never** deliberately ignore a Rule 1925 order [thereby waiving the defendant's claims on appeal]. But, the [FCDO] is financed and positioned to strategize differently and globally. In Pennsylvania capital cases, the [FCDO] routinely argues in federal *habeas* court that various Pennsylvania procedural default rules are arbitrarily applied, and therefore should be ignored. The reward, if the federal court accepts the argument, is *de novo* federal review, unimpeded by state court findings, and unimpeded by the federal *habeas* standard of review requiring deference to state court decisions. The result of this perverse system of incentives for professional capital counsel who ping-pong back and forth between state and federal courts, and who have seemingly inexhaustible federal resources and ample cases to choose from, is an opportunity and incentive to feign that they do not know how to comply with state procedural rules, *see [Commonwealth v.] Steele* [599 Pa. 341], 961 A.2d [786], 834-38 [ (Pa.2008) ] (Castille, C.J., joined by McCaffery, J., concurring); and in the process attempt to generate "uneven" procedural default rulings by the state courts. Then, counsel will proceed to argue in federal court that the particular default rule should be ignored in **all** cases. The state response, faced with con-

tinuing federal criticism that our procedural rules have too much discretionary flexibility to be considered legitimate expressions of state sovereignty, is to adopt less flexible rules. *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1150 (2008) (Castille, C.J., joined by McCaffery, J., concurring) ("The threat of dismissive federal responses to flexible state procedural rules can lead to state legislatures and courts adopting ever-more inflexible rules.").

But, for those with the luxury to pursue a global agenda, this refinement does not end the incentive to create disruption in state court; it just requires a shift in strategy. Faced with a clear, simple, and known rule such as Appellate Rule 1925, counsel can ratchet up the stakes by deliberately engaging in the most overt of defaults, daring the state court to apply its "inflexible" Rule. If the state devises an exception, the [FCDO] will then proceed to federal court, in all cases involving Rule 1925 waivers and say; "Aha, they do not always follow the default; you may ignore it and consider my claims *de novo*."

*Spotz*, 18 A.3d at 343–44 (Castille, C.J., joined by McCaffery, J., concurring) (describing FCDO tactics in *Commonwealth v. Hill*, 609 Pa. 410, 16 A.3d 484 (2011)). It is one thing if a state, of its own devices, adopts procedural mechanisms that are unevenly or unfairly applied, and unreasonably burden the ability to litigate federal claims. But, it is quite another thing to have a federally-financed, but non-accountable, private organization deliberately inject itself into state court cases so that it can foster and create those situations, as part of a strategy to subvert the proper role of state courts in favor of *de novo* federal review. That is simply unethical and improper. Pennsylvania cannot abide this agenda.

The FCDO conduct in *Dougherty* is another example of this pernicious effect: the FCDO, the prime source of delay in capital PCRA litigation, walks into federal court, falsely blames all delay in all capital cases on this Court, and then argues that the effects of the delay are a valid reason to subvert state court processes. Or, consider *Abdul–Salaam*, where the FCDO conjures up a claim involving a false accusa-

tion that this Court had an outright corrupt motivation in its rejection of one of the defendant's claims, and then asserts in federal *habeas* that its false accusation is a basis for ignoring this Court's decision on the merits.

A recent change in *habeas* review represented by the U.S. Supreme Court's decision in *Martinez v. Ryan,* 566 U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), will invite further abuses if the FCDO's obstructionist agenda is permitted to continue. This Court explained the holding and effect of *Martinez* in *Commonwealth v. Holmes,* 621 Pa. 595, 79 A.3d 562 (2013):

> The *Martinez* Court recognized that there are "sound reasons" for a state to defer consideration of ineffectiveness claims to collateral review: *e.g.,* such claims often depend upon evidence outside the trial record; direct appeal may not be as effective as other proceedings for developing such claims; and there may not be adequate time within governing appellate rules to allow for necessary expansion of the record. *Martinez,* 566 U.S. at ——, 132 S.Ct. at 1318 . . . . However, the *Martinez* Court held, there are "consequences" arising from the choice to defer ineffectiveness claims that will affect the State's ability to argue, upon later federal *habeas* review, that the defendant defaulted trial counsel ineffectiveness claims by failing to raise them in state court. "By deliberately choosing to move trial ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims. It is within the context of this state procedural framework that counsel's ineffectiveness in an initial-review collateral proceeding qualifies as cause for a procedural default." 566 U.S. at ——, 132 S.Ct. at 1318 . . . .
>
> Martinez is significant in its emphasis on the centrality of claims of ineffective assistance of trial counsel. Indeed, the Court stressed at some length the "bedrock" importance of effective counsel at trial and the derivative importance of opportunities to litigate claims of trial counsel ineffectiveness, which the Court went so far as to characterize as

claims of "trial error." *Id.* at ——, 132 S.Ct. at 1317–18. ... The Court's cause and prejudice holding, in essence, created a federal safety valve to allow for a third level of review—exclusively federal—if the subject claim involved a trial default, and initial collateral review counsel did not recognize it.

*Id.* at 582–83. Given the prior conduct of the FCDO in deliberately seeking to create state procedural defaults that will not be honored by federal *habeas* courts, the organization can be expected to manipulate claims they raise in state court, in order to take advantage of the *Martinez* exception. It is far better to have capital PCRA matters handled by lawyers who do not pursue such global, unethical agendas, but who instead ethically and zealously pursue their **client's** cause.

Finally, the FCDO's dubious self-involvement in virtually all Pennsylvania capital cases creates another potential issue. Since the manner of its involvement is not regulated by any entity, judicial or otherwise, we can expect to see claims from defendants, in state and federal court, deriving from both the secretive manner of the FCDO's self-involvement as well as the dubious tactics employed once the FCDO is involved. Again, it is better to have lawyers appointed by and responsive to Pennsylvania courts, and devoted to their clients, while dutiful to ethical obligations, court processes, court rules, and court orders, rather than lawyers devoted to an obstructionist and ultimately political agenda, which includes strategies to marginalize state courts.

The FCDO may have removed to federal court the discrete question this Court framed in *Mitchell* directing the FCDO to prove its asserted claim that it did not divert federal funds to support its private agenda in that one PCRA matter. Irrespective of the outcome of the removal question in the Third Circuit, it is this Court—and not any federal entity—that is responsible for the supervision of the practice of law in Pennsylvania, and we play a special role in capital cases, even beyond our general superintendency over the Unified Judicial System. The FCDO may be able to shield itself from inquiry by its risible claim to be a federal contractor in PCRA cases—

at the same time swearing, to this Court, that it is acting "privately" in Pennsylvania—but Pennsylvania is not obliged to be complicit in **any** Pennsylvania lawyer's deceptive, dubious or improper activities. And, this Court is certainly not obliged to defer to the FCDO's private litigation agenda when it comes to a determination of the proper representation of capital defendants in PCRA matters across the Commonwealth. Given the FCDO's course of conduct, this Court should exercise its power to remove FCDO lawyers from all Pennsylvania cases, just as we can remove any lawyer in an individual case whenever there is a grounded concern that the lawyer's conduct is adversely affecting the administration of Pennsylvania justice.

The consequence of this corrective measure, of course, is that Pennsylvania has to accept and discharge the task of providing ethical, competent, properly-resourced, and properly-compensated attorneys to discharge the defense function in capital PCRA litigation. I am confident that Pennsylvania is up to the task, and the end result should be a fairer, more just, swifter, and less-politicized progression of Pennsylvania's capital cases.

## IX. The Commonwealth's Motions

What remains are the Commonwealth's Motion for Sanctions and the Commonwealth's request for a Rule to Show Cause why the FCDO should not be held in contempt. The Motion for Sanctions is premised upon the Motion to Withdraw Concurring Opinion. The Commonwealth argues, among other points, that this Motion neither complies with nor is contemplated by the Appellate Rules, and is meritless in some parts, and frivolous in others. The Commonwealth seeks sanctions in the form of striking the pleadings; fining counsel; quashing the Motions; referral of counsel to the Disciplinary Board; and payment of the Commonwealth's attorney fees and costs. The contempt request is premised upon the FCDO's failure to respond to the Court's initial directive to provide a Verified Statement, and its choice instead to file its argumentative Withdrawal pleading. That

strategic choice put the Court to the trouble of drafting an administrative enforcement order, inconvenienced the Commonwealth by extending the litigation, and led to a series of other pleadings, further burdening the Court.

Without downplaying the Commonwealth's obviously legitimate grievances, specific sanctions, if any, are better left to the formal disciplinary process, if any should result, in this individual case. As the Commonwealth recognizes, the broader problem that has been revealed is not the FCDO's misconduct here, but the very fact of its institutional self-involvement in so many Pennsylvania capital PCRA matters. I have explained what I believe is the necessary and appropriate response above; that proposed response, like the response the Court has already incorporated into its briefing rules, does not depend upon the input, or involvement, of disciplinary authorities.

Meanwhile, the conduct of the FCDO relative to its post-decisional motions here is better viewed in the context of this one case. I have explained above that the FCDO's conduct in the PCRA court was abusive, and its Brief here was equally problematic. As Mr. Justice Saylor noted in his Concurring Opinion, in response to my Concurring Opinion addressing broader concerns respecting the FCDO's practice in Pennsylvania, "a referral to our lawyer disciplinary apparatus is warranted," to permit involved FCDO counsel to respond, and to provide a foundation for imposition of any appropriate sanctions. *Spotz*, 18 A.3d at 354 (Saylor, J., concurring). The post-decisional Motions, administrative orders, Verified Statement, and the FCDO chart have provided more of a foundation to assess the conduct at issue here; and as reflected in the Commonwealth's complaints, this additional litigation has raised further questions of concern. The better course in terms of possible sanctions, arising from this individual case, is by a formal inquiry. Hence, I will deny the Commonwealth's requests.

### ORDER

AND NOW, this 3rd day of September, 2014, and in accordance with a Single Justice Opinion I am filing this same date,

Appellant's Motions to File Post–Submission Communications, Appellant's Motion for Recusal of Chief Justice Castille, Appellant's Motion for Withdrawal of Concurring Opinion, Commonwealth's Answer and Motion for Sanctions, Appellant's Withdrawal of Motion for Withdrawal of Concurring Opinion and Motion for Recusal, Commonwealth's Answer, including Request for a Rule to Show Cause, Commonwealth's Request for Leave to Respond to Verified Statement, and Appellant's Motion to Strike Commonwealth's Response have been reviewed and are hereby resolved as follows:

(1) Appellant's initial Motions for Leave to File Post–Submission Communications are **DENIED.** The Motions do not fall within the post-submission communication appellate rule appellant cites. However, I have entertained the Motions as a discretionary matter, out of deference to the concerns expressed by officers of the Court.

(2) The "Withdrawal" pleading file by the Federal Community Defender's Office ("FCDO") on August 22, 2011, which the Court as a whole has construed as an Application for Relief seeking leave to withdraw the prior Motions, is (a) **GRANTED** as to the recusal motion, but (b) **DENIED** as to the motion to withdraw my Concurring Opinion.

(3) Appellant's Motion for the Withdrawal of my Concurring Opinion is **DENIED,** as is the request to refer that Motion to the full Court for decision (beyond the referral already made for the administrative purpose leading to the Court's *per curiam* orders entered on July 28, 2011 and October 3, 2011, to ascertain information necessary to decide the Motion).

(4) The Commonwealth's Motion for Sanctions, taken under advisement in the Court's Order of July 28, 2011, and the Commonwealth's request for a rule to show cause why the FCDO should not be held in contempt of court, taken under advisement in the Court's order of October 3, 2011, are **DENIED.** Sanctions are better left to a formal disciplinary process, if any should result.

(5) The remaining Motions and responses (including requests for leave to file) are **DENIED** as unnecessary to resolution of the issues discussed in this Opinion, including: (1) the Commonwealth's Request for Leave to Answer the FCDO's Verified Statement (with answer attached), and the FCDO's Reply thereto; and (2) the Commonwealth's Response to the Answer for Sanctions, the FCDO's Motion to Strike that Response, and the Commonwealth's Answer to the Motion to Strike.